GOLD DUST MINES, INC., Delmer
M. Ackels, and Gail Ackels,
Appellants,

v.

LITTLE SQUAW GOLD MINING
COMPANY, Appellee.

Gold Dust Mines, Inc., Delmer M. Ackels,
and Gail Ackels, Appellants,

v.

Little Squaw Gold Mining
Company, Appellee.

Nos. S–13530, S–13909.

Supreme Court of Alaska.

Sept. 28, 2012.

Rehearing Denied April 30, 2013.

Thomas R. Wickwire, Fairbanks, for Appellants.

Aisha Tinker Bray, Guess & Rudd P.C., Fairbanks, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

CARPENETI, Chief Justice.

## I. INTRODUCTION

Two mining companies entered a ten-year mining lease. The lessee was responsible for mining and prospecting claims owned by the lessor and its president. The companies entered a holdover tenancy after the expiration of the lease. During this time, an officer of the lessee company staked mining claims that overlapped with the claims his company had mined under the ten-year lease. In his own name, that officer filed location notices for the newly staked claims with the State Department of Natural Resources. The parties disagreed about who rightfully owned the claims staked during the holdover tenancy and broke off their lease agreement in October 2003.

In 2007, the former lessor filed suit against the former lessee and its two officer-shareholders, seeking to quiet title to the disputed mining claims, to eject the former lessee and its officers from the claims, and to secure damages under several tort and contract causes of action. The former lessee denied various allegations, raised 13 affirmative defenses, and counterclaimed for the value of labor performed on the claims. Following a three-week trial, the superior court resolved the dispute in favor of the former lessor. The former lessee filed two appeals of post-trial orders, which we have consolidated for decision. We affirm the superior court on all but one issue: Because specific findings are needed to pierce the corporate veil, we reverse the entry of judgment and the award attorney's fees against the wife of the officer of the lessee company and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Background: Mining Laws

This case arises under our state's mining laws. Because the relevant facts are intimately related to the requirements of state mining statutes, we begin by briefly describing the legal background of this case:

> Under Alaska law, mining rights on state lands are acquired through the process of "location." This process entails the discovery [of valuable minerals] and marking of the claim, the posting of a notice at the claim site, and the recording of a certificate of location [with the Department of Natural Resources]. Through location, a locator acquires a mining claim priority against subsequent locators to the selected claims.[1]

Although the locator does not have exclusive use of the surface estate of a mining claim, the locator may exclude other parties from unreasonable uses of the surface estate.[2] An

---

**1.** *Moore v. State, Dep't of Natural Res.*, 992 P.2d 576, 578 (Alaska 1999) (citing AS 38.05.195; AS 38.05.210–211; and 11 Alaska Administrative Code (AAC) 86.200–221); *see also* 11 AAC 86.105 and .200.

**2.** AS 38.05.255.

attempted location is void if it overlaps with mining claims held by others.[3]

The locator of a mining claim, when filing a location notice with the Department of Natural Resources, gives the claim a name. (Many long-standing mining claims, including some of the claims in dispute here, have colorful names.) In addition to its name, each claim can be identified by a unique Alaska Department of Land or "ADL" number. The names and numbers identify surface estates no greater than 160 acres, and often only 40 acres. Many traditional mining claims are not perfect squares staked along north-south, east-west lines.

Under the Department of Natural Resources' modern claim-recording system, the geographic location of a claim is identified by reference to the meridian, township, range, section, quarter-section, and quarter-quarter-section coordinates of the public land survey system.[4] The MTRSC system requires miners to locate claims along north-south, east-west lines.[5] This system has not extinguished the validity of traditional mining claims previously recorded under the non-MTRSC system.[6] The MTRSC system was adopted to "improve accuracy, accessibility, and timeliness of [claim location] data."[7] The state's centralized claim-recording system makes it easy to compare the geographic locations of recorded claims, and if the recorded information is accurate, to identify overlapping claims.[8]

In order to maintain a mining claim, the locator must comply with various statutory requirements. These include making annual rental payments to the state[9] and performing annual labor for the benefit of the claim.[10] To satisfy the annual labor requirement, the claim-holder must submit annually to the Department of Natural Resources an affidavit attesting to the work performed.[11] When work performed in a given year exceeds the statutory requirement for that year, "the excess value may be applied against labor required to be done during the subsequent year or years, for as many as four years."[12] The claim-holder may be required to obtain a permit for certain uses of the surface estate while mining.[13] Failure to comply with certain statutory requirements constitutes abandonment of a mining claim.[14] However, in some circumstances, a claim holder may cure the abandonment that resulted from a failure to record annual labor or pay rents as required.[15]

In addition to statutes and regulations, mining rights are governed by longstanding common law and equitable doctrines, includ-

---

3. AS 38.05.245(b).

4. AS 38.05.195(b)(1)-(2) (authorizing claim-location by reference to meridian, township, range, and section); *see also* 11 AAC 86.202 (defining traditional mining claims and MTRSC (meridian/township/range/section) claims by reference to AS 38.05.195(b)(1) and (2)).

5. AS 38.05.195(b)(2) ("[T]he boundaries of a claim ... shall run in the four cardinal directions unless the claim is a fractional claim or the commissioner determines that staking in compliance with this paragraph is impractical....").

6. *See* AS 38.05.195(b) (recognizing claims recorded under MTRSC system and non-MTRSC claims).

7. Minutes, Sen. Res. Comm. Hearing on S.B. 175, 21st Leg., 2d Sess. (Feb. 21, 2000) (testimony of Steve Borrell, Alaska Miners Assoc. Exec. Dir.).

8. AS 38.05.195(b)(1) provides that, in the event of a conflict over boundaries for the quarter section or quarter-quarter section, "the corners marked on the ground of a claim established in accordance with this paragraph and regulations of the commissioner control."

9. AS 38.05.211.

10. AS 38.05.210.

11. 11 AAC 86.220(c).

12. AS 38.05.210(a).

13. 11 AAC 96.010. *Cf.* 11 AAC 86.150 (authorizing use of mining plan of operations instead of permit in some cases).

14. AS 38.05.265(a); *see also AU Intern., Inc. v. State, Dep't of Natural Res.*, 971 P.2d 1034, 1038 (Alaska 1999) ("[F]ailure to record a statement of annual labor constitutes abandonment, without regard to intent.").

15. *See* AS 38.05.265(b); *see also* 11 AAC 86.125 (substantial rather than strict compliance authorized by Commissioner on a case-by-case basis).

ing the rules of contract law governing mining leases.

## B. Facts

Little Squaw Gold Mining Company [16] is an Alaska corporation that has held mining claims in the Chandalar mining district since the early 1970s. In 1972, Little Squaw obtained the rights to various mining claims from Eskil Anderson, who exchanged these claims for shares of Little Squaw stock and became Little Squaw's president that year. In the 1980s, Anderson and Hollis Barnett located new claims on behalf of Little Squaw, including Upper Discovery on Big Creek (ADL 515447), Number Five Below Upper Discovery on Big Creek (ADL 515452), and Number Two Above Discovery on Little Squaw Creek (ADL 515445). Around the same time, Anderson located, in his own name, other claims that he later transferred to Little Squaw, including Star East Fraction (ADL 515473) and Golden Eagle Fraction. (ADL 515474) Although these claims were located by Anderson, Little Squaw managed these claims from discovery onwards.

Gold Dust Mines, Inc. is an Alaska corporation. Its sole shareholders, directors, and officers are Delmer M. Ackels (Del) and Gail E. Ackels (Gail). (In this opinion, we use "Gold Dust" to refer to the appellants collectively and "Gold Dust Mines" to refer to the company.) Del began mining on Gold Dust Creek in the late 1960s and in the Chandalar district in 1989. In 1989, Gold Dust Mines entered into a ten-year lease with Little Squaw, and Del personally guaranteed the company's obligations under the lease. Under the terms of the lease, Gold Dust Mines was to mine and prospect Little Squaw's Chandalar district mining claims and complete the statutorily required annual labor on those claims. In addition, Gold Dust Mines was required to pay Little Squaw an annual fee and a percent of royalties on minerals and metals extracted.

In 1999, Little Squaw managed 112 mining claims in the Chandalar mining district, including several mining claims relevant to the present dispute. Little Squaw was required to complete $11,200 of labor to meet the statutory labor requirement on those claims. That year Del completed $108,000 worth of work on behalf of Little Squaw, including airstrip and road maintenance, mine-site preparation, stripping, processing, and reclamation on Little Squaw's claims 7 Below Discovery on Big Creek, 7 Below East on Big Creek, and other unspecified locations on Tobin Creek and Big Creek. He submitted to the Department of Natural Resources an affidavit describing this work and listing the 112 mining claims that Little Squaw managed at the time.

In 1999, Gold Dust Mines' compliance with other terms of the lease faltered. The company failed to make its annual payment to Little Squaw. It also failed to pay the royalty due on production and state rental payments due on Little Squaw's claims. Around that time, Del was having financial trouble; he asserts that his mining business suffered as a result of broken equipment and a dispute with the equipment dealer. Both Del and Gail filed a petition for personal bankruptcy in February 2000, five months after the scheduled expiration of Gold Dust Mines and Little Squaw's ten-year lease. On the bankruptcy petition, Gold Dust Mines was listed among the assets as an "inactive" company without liabilities or assets. The lease with Little Squaw was listed under the heading of executory contracts and unexpired leases in which the debtors have an interest. Little Squaw was listed as a debtor for the sum of $7,500, the amount of the lease payment that Gold Dust Mines owed from 1999.

Around 2000, by failing to make statutorily required payments to the state, Little Squaw abandoned 86 of the mining claims it managed in the Chandalar mining district. The record strongly suggests that the missed payments and abandonment were the result of Gold Dust Mines' failure to pay Little

---

**16.** During the course of this litigation, Little Squaw Gold Mining Company changed its name to Goldrich Mining Company. To avoid confusion, we follow the parties' practice of referring to this company as Little Squaw, the name under which it had been operating when it filed this action.

Squaw $7,500 due under the lease in 1999.[17] Little Squaw and Anderson held on to the remaining 26 mining claims, including Number Two Above Discovery on Little Squaw Creek (ADL 515445); Upper Discovery on Big Creek (ADL 515447); Number Five Below Upper Discovery on Big Creek (ADL 515452); Star East Fraction (ADL 515473); and Golden Eagle Fraction (ADL 515474). In 2000, Little Squaw relied on excess assessment work that Del had performed in 1999 in order to comply with state labor requirements for its 26 claims in the Chandalar mining district.

Although the parties continued to communicate about the mining claims through 2003, they dispute whether they renewed the terms of the original lease upon its expiration in 1999. Gold Dust Mines did not make payments under the lease between 2000 and 2002. However, during this period, Del's mining equipment remained on the surface of claims that, as Gold Dust Mines' agent, he had mined for Little Squaw. Little Squaw maintained that Gold Dust Mines and Little Squaw continued to operate under the terms of the lease in a "holdover tenancy" until October 2003. Del asserted that in 2000 he and Little Squaw were operating under the terms of a separate oral contract, which allowed him to store his equipment on Little Squaw's claims in exchange for performing annual labor on the claims. A jury ultimately found that a holdover tenancy existed and that the parties were not operating under the terms of a separate oral contract.

In July 2003, Del recorded with the Department of Natural Resources location notices for various mining claims he had staked that summer.[18] There is evidence suggesting that all of these claims overlap with the locations that Del had mined for Little Squaw under their 1989 lease agreement.

In 2003, Richard Walters replaced Eskil Anderson as president of Little Squaw. Around the same time, Anderson transferred to Little Squaw title to Star East Fraction and Golden Eagle Fraction, two claims that Little Squaw had managed since the late 1980s. In September 2003, Walters and Del Ackels had a confrontation at a Fairbanks restaurant. Shortly thereafter the holdover tenancy was terminated.

In 2003 and 2004, Little Squaw recorded new location notices for mining claims that overlapped with its previously recognized claims. It identified the relevant claims as: LSGMC 811 (ADL 641356); LSGMC 910 (ADL 641528); LSGMC 911 (ADL 641529); LSGMC 912 (ADL 641530); LSGMC 1012 (ADL 641540); LSGMC 1117 (ADL 641553); and [2004] No. Two Above Discovery (ADL 645852). After Little Squaw had re-staked some of its claims, Gold Dust Mines filed amendments to correct errors in some of its 2003 filings. Three amendment notices changed the recorded locations of GDM 1, GDM 2, and LSO 4; and one corrected a deficiency in the location date of GDM 17.

During the course of this competitive staking, the parties communicated with employees at the Department of Natural Resources about the validity of the claims and amendments filed in 2003 and 2004. In September 2003, the Department invited Del to amend deficient posting dates in the Location Notices for GDM 16 and GDM 17 and notified him that GDM 17 might conflict with one of Little Squaw's claims (Number 5 Below Upper Discovery; ADL 515452). In the fall of 2008, shortly before the trial to resolve this dispute began in superior court, the Department of Natural Resources issued a written determination stating that four Amended Location Notices filed by Del Ackels for GDM 1, GDM 2, GDM 17, and LSO 4 were invalid.

---

17. Some evidence suggests that Anderson, who was unable to testify in 2008 because of dementia, may have lost track of details of Little Squaw's business several years before this case went to trial while some evidence suggests that Little Squaw may have deliberately abandoned the claims.

18. These claims included: GDM 1 (ADL 641352), GDM 2 (ADL 641353), GDM 3 (ADL 641354), GDM 4 (ADL 641355), GDM 5 (ADL 641356), GDM 6 (ADL 641357), GDM 7 (ADL 641358), GDM 8 (ADL 641359), GDM 9 (ADL 641360), GDM 10 (ADL 641361), GDM 11 (ADL 641362), GDM 12 (ADL 641363), GDM 13 (ADL 641364), GDM 14 (ADL 641365), GDM 15 (ADL 641366), GDM 16 (ADL 641367), and GDM 17 (ADL 641368), LSO 1, LSO 2 (ADL 641349), LSO 3 (ADL 641350), LSO 4 (ADL 641351).

## C. Proceedings

In February 2007, Little Squaw filed suit in superior court alleging that Gold Dust improperly staked and recorded claims that belonged to Little Squaw. The complaint presented 16 causes of action including quiet title, removal of clouds on title, ejectment, trespass, conversion of gold and other personal property, conversion of information, breach of contract, breach of fiduciary duty, piercing the corporate veil, and indemnity for liabilities of Gold Dust Mines. In its answer to the complaint, Gold Dust denied various allegations and raised 13 affirmative defenses including statute of limitations, forfeiture of mining claims, discharge in bankruptcy, estoppel, laches, unclean hands, breach of covenant of good faith and fair dealing, and several reasons that the lease was not enforceable (including lack of consideration and performance excused by breach). Gold Dust also counterclaimed for $52,000 for assessments that it performed on claims that Little Squaw abandoned.

Superior Court Judge Randy M. Olsen resolved some issues on summary judgment, decided others by directed verdict, and submitted others to a jury. Based on trial testimony, the court reversed a partial grant of summary judgment that it had issued earlier in the case concerning Gold Dust Mines' right to stake claims on its own behalf under the terms of the lease. At trial, Gold Dust attempted to show that by failing to satisfy statutory requirements in 2000, Little Squaw had abandoned the relevant claims and had no rights in those claims under the lease. In turn, Gold Dust argued that the lease was invalid and that it owed Little Squaw no duty to stop from staking claims. At trial, Little Squaw maintained that it had preserved its rights to the disputed claims, with which Del and Gold Dust Mines improperly interfered.

After a three-week trial, the case was resolved in Little Squaw's favor. Using factual determinations made by the jury, the court concluded that Little Squaw was not time-barred from bringing its claims, recognized Little Squaw's title to the disputed mining claims, granted judgment to Little Squaw on the ejectment and trespass claims, dismissed Gold Dust's counterclaims, and authorized Little Squaw to pierce Gold Dust Mines' corporate veil (thereby holding the Ackelses personally liable) for losses arising after 2003. These conclusions were summarized in the superior court's written findings and conclusions of March 20, 2009.

After trial and before the superior court issued its findings of fact and conclusions of law, Del submitted an application to the Department of Natural Resources for a five-year permit to mine claims located at Township 31, Range 3 West, Sections 10, 15, and 16. Del traveled to those claims in March 2009 and obtained a copy of the court's findings and conclusions upon his return to Fairbanks.

Following the entry of the superior court's order, Del applied for another permit to mine in Fairbanks Meridian, Township 31 North, Range 3 West, Section 28. In July 2009, Del traveled to these claims to begin mining them for the season. Little Squaw believed that Del was mining within the boundaries of its claims and moved for the superior court's intervention. On July 29, 2009, the superior court issued an Order in Aid of Final Judgment, which ordered Del off all of Little Squaw's mining claims. Following his receipt of this order, Del stopped his mining activity.

In November 2009, the superior court held a hearing in which it considered Little Squaw's motion to hold Del in contempt for refusing to obey court orders.[19] The superior court concluded that "[Del's] explanation [of his 2009 mining activity] is flaky, but not illegal ... there's enough wiggle room ... not to find that he was in contempt of the court order." At the end of that hearing, the superior court explained that it would address the issue of reclamation costs resulting from the 2009 mining at another time.

Following a hearing on damages in May 2010, the superior court ordered Gold Dust Mines and the Ackelses to pay $15,862.24 for

---

**19.** A Department of Natural Resources employee had informed Little Squaw's counsel that the Department would revoke Del's permit to mine if he were held in contempt for trespassing on Little Squaw's claims.

the costs of reclaiming the land Del mined in July 2009. This damages award was based on the superior court's conclusion that Del's 2009 mining activity took place within the boundaries of Little Squaw's GRMC 14 and 15 claims, and not within the boundaries of GDM 18. The superior court entered an enhanced attorney's fees award, naming Little Squaw the prevailing party.

Gold Dust Mines and Del and Gail Ackels appeal the superior court's findings and conclusions of March 2009 as well as the post-trial order for damages arising from the summer 2009 mining activity. We have consolidated these two appeals.

## III. STANDARD OF REVIEW

■ This case involves both factual and legal questions. The court's factual findings [20]—such as those concerning credibility and why Del Ackels stopped mining in 2009—should not be overturned unless they are clearly erroneous.[21] In reviewing questions of law-here, concerning the application of state mining statutes and regulations—we "adopt the rule of law that is most persuasive in light of precedent, reason and policy." [22]

■ Attorney fee awards are reviewed for abuse of discretion.[23] We will not reverse an award unless it is "manifestly unreasonable." [24]

## IV. DISCUSSION

■ The issues before us are complicated.[25] In the 15–part discussion that follows, we explain our resolution of each of Gold Dust's arguments. But at the outset, we note the similarity between this case and *Miscovich v. Tryck.*[26] The equitable reasoning utilized in that case helps resolve much of the present dispute. In *Miscovich*, we affirmed the application of a constructive trust in an action to quiet title to disputed mining claims,[27] relying on the following rule:

> One who has contracted or agreed to perform annual assessment work on a claim cannot, by relocating it after his failure to do the work, acquire any interest adverse to that of the prior claimant. Courts have either held his location void, or held him to be trustee for the benefit of the prior locator.[28]

That is just what the superior court did in the present case. Based on the jury's finding that the lease was in operation until October 2003, the superior court concluded that 20 claims Del staked in July 2003 were held in constructive trust for Little Squaw. Based on our review of the record, we believe the award of best title to Little Squaw was justified. Evidence in the record suggests all of the claims awarded to Little Squaw overlapped with locations Gold Dust had mined for Little Squaw under the 1989 lease. Although the parties here did not give much attention to that case, it was clearly instructive to the superior court and provides a context for the parties' dispute.

### A. The Superior Court Did Not Err In Reversing Its October 3, 2008, Partial Order Of Summary Judgment.

Gold Dust argues that we should reverse the jury finding that the mining lease was in

---

**20.** In this case, none of the jury's factual findings as set out in the special verdict were challenged by Gold Dust.

**21.** *McCormick v. City of Dillingham,* 16 P.3d 735, 738 (Alaska 2001).

**22.** *Miscovich v. Tryck,* 875 P.2d 1293, 1297 (Alaska 1994) (citing *Guin v. Ha,* 591 P.2d 1281, 1284, n. 6 (Alaska 1979)).

**23.** *Joseph v. Jones,* 639 P.2d 1014, 1019 (Alaska 1982).

**24.** *Welcome v. Jennings,* 780 P.2d 1039, 1043 (Alaska 1989).

**25.** They concern the duration and terms of the mining lease, the interpretation of state mining statutes, the effect of Department of Natural Resources' adjudications, the equitable doctrines of estoppel and constructive trust, the applicable statute of limitations, whether the superior court's reversal of its own grant of partial summary judgment was proper, whether certain issues were tried by consent, whether the enhanced attorney's fees award was justified, and whether entry of judgment against an officer-shareholder was proper.

**26.** 875 P.2d 1293 (Alaska 1994).

**27.** *Id.* at 1299–1300 (quieting title to disputed mining claims).

**28.** *Id.* (citing 2 AMERICAN LAW OF MINING, § 38.03[4]).

operation until October 2003 and reinstate the court's earlier summary judgment ruling interpreting the contract. According to Gold Dust, the superior court's decision to reverse its earlier summary judgment ruling more than a week into the trial was barred by the law of the case doctrine. It seems to further argue that the court's decision to reverse its earlier ruling was procedurally unsound and resulted in prejudice: "If Ackels had thought that going to trial on the remaining issues would put the claims and rights awarded him by summary judgment at risk, he would have weighed the trial risks differently, altered his settlement position, and perhaps the case would have settled."

Little Squaw defends the superior court's decision to reverse its earlier summary judgment ruling based on Del's trial testimony. Citing our precedents in *West v. Buchanan*[29] and *Bylers Alaska Wilderness Adventures, Inc. v. City of Kodiak*,[30] Little Squaw contends that the superior court may reconsider a prior ruling that is unreasonable or untenable. Little Squaw explains that Del's own testimony about the meaning of the lease prompted the superior court's decision to revisit the contract issue and points out that Gold Dust failed to raise any objection when the superior court stated its intention to revisit the earlier ruling.

■ "The law of the case doctrine in Alaska 'generally requires adherence by a lower court to an appellate court's decision and generally prohibits reconsideration of issues which have been adjudicated in an appeal of the case.'"[31] But "a superior court judge's failure to follow an order of a prior superior court judge does not violate the law of the case doctrine."[32] The law of the case doctrine is of limited relevance in evaluating the superior court's decision to vacate a pretrial ruling, and it does not apply here.

■ Gold Dust's second argument invokes a more relevant legal concept—prejudice resulting from party's reliance on a court's earlier ruling. But this argument also misses the mark. As we explained in *West*, "it is entirely reasonable for a judge whose responsibility it is to try a case to reconsider and reverse an earlier ruling if convinced that that ruling was erroneous."[33] We have not before addressed the circumstances in which a superior court can reverse its own prior ruling, but the policy applied in *West* and *Byler* applies here with equal force; that is, the superior court should be allowed to reconsider and reverse an earlier ruling if convinced that the earlier ruling was erroneous.

■ In this case, the court was compelled to reverse its earlier ruling because Del testified at trial that any claims he staked under the lease would have been staked for Little Squaw. The court's earlier interpretation of the contract was untenable in light of this testimony and at odds with our reasoning in *Miscovich*. Moreover, the superior court's decision to reverse its earlier interpretation of the contract still left open the question of how long the contract was in operation, and the parties litigated this issue vigorously. Finally, because Gold Dust did not object to the superior court's treatment of the contract issue at trial, we review this question for plain error.[34] We find no plain error in the superior court's decision. Moreover, we perceive no prejudice to Gold Dust as a result of the superior court's decision to reverse its earlier summary judgment ruling.

### B. Jury Instruction No. 18 Was Not Erroneous.

Gold Dust challenges the superior court's Jury Instruction No. 18 because it did not require a finding of agreement between the lessor and tenant as to the consequences of a lessee continuing in possession after the termination of the lease. And it argues that

**29.** 981 P.2d 1065 (Alaska 1999).

**30.** 197 P.3d 199 (Alaska 2008).

**31.** *Id.* at 206. (quoting *Mogg v. Nat'l Bank of Alaska*, 846 P.2d 806, 810 (Alaska 1993)).

**32.** *Id.*

**33.** *West*, 981 P.2d at 1067 (internal quotation marks and citation omitted).

**34.** *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) (quoting *Raphael v. State*, 994 P.2d 1004, 1015 (Alaska 2000)).

whether the lease was in operation after 2000 should not have been submitted to the jury because Little Squaw was incapable of leasing out claims it had abandoned. Thus, Gold Dust maintains that there could not have been a meeting of the minds over whether to extend the lease.

Little Squaw responds that the jury instruction properly stated the law governing holdover tenancy and points out that Gold Dust failed to object to the instruction at trial. Little Squaw further contends that it did not abandon any of the mining claims at issue in this litigation.

▆▆▆ In the absence of a proper objection, we "will not review a jury instruction unless the instruction constitutes plain error."[35] Our law on holdover tenancies is quite clear: "[W]hen a tenant continues in possession, or holds over, beyond the term of a lease, the landlord has the election of treating him as a trespasser or permitting him to remain in possession."[36] If the landlord chooses to treat the tenant as a holdover, the landlord may continue to collect rents under the lease.[37] Alternatively, if the landlord elects to treat the tenant as a trespasser, the landlord may evict the tenant and seek damages for the reasonable value of the use of the premises.[38] The landlord, however, may not choose to pursue both remedies.[39]

In this case, the court instructed the jury, in relevant part:

If the lessee is a holdover the landlord has two choices of action:

a. Eviction—the lessor may treat the holdover lessee as a trespasser and evict him.

b. Creation of periodic tenancy—The landlord in his sole discretion, may bind the lessee to a new periodic tenancy. The terms and conditions of the expired lease apply to the new tenancy. If the original lease was for a term of more than one year, a year-to-year tenancy results from holding over.

This jury instruction is not plain error; indeed, it provides a clear statement of the governing law. Because Gold Dust did not object to the instruction, we need not address the effect of the alleged abandonment on the lease. We find no error.

## C. Del Ackels's Personal Bankruptcy Does Not Bar The Operation Of A Holdover Tenancy.

Gold Dust argues that any obligations under the lease were extinguished when the Ackelses filed for bankruptcy in 2000. Little Squaw contends that the bankruptcy order did not extinguish Gold Dust Mines' obligations under the lease because the company's obligations resulted from its conduct after Del filed the bankruptcy petition.

▆▆▆ A discharge order from a bankruptcy court prohibits creditors from collecting prior debts subject to the discharge.[40] The bankruptcy code looks to state law to determine when a corporate entity is a legal person distinct from its shareholders.[41] Although we have not specifically considered whether a person filing personal bankruptcy and a company owned by that person are distinct legal entities, the conclusion that the individual debtor and a company co-owned by

35. *Aviation Assocs., Ltd. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1131, n. 7 (Alaska 1994) (defining plain error as a circumstance where the "jury instruction obviously creates high likelihood that the jury will follow erroneous theory resulting in miscarriage of justice") (internal quotation marks omitted).

36. *Brown v. Music, Inc.*, 359 P.2d 295, 297 (Alaska 1961).

37. *Id.*

38. *Id.*

39. *Id.*

40. *See* 11 U.S.C. § 524(a) (2006) ("A discharge in a case under this title ... voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged....").

41. *See, e.g., In re Blatstein*, 192 F.3d 88, 100–01 (3d Cir.1999) (rejecting argument to reverse judgment piercing corporate veil under Pennsylvania corporate law because company co-owned by Chapter 7 bankruptcy debtor was a distinct legal entity from, and alter ego of, the debtor).

the debtor are distinct flows directly from the foundations of Alaska corporate law.[42]

On February 1, 2000, Del and Gail Ackels filed a voluntary petition for Chapter 7 bankruptcy. Three months later, the U.S. Bankruptcy Court ordered a discharge "to the person[s] named as the debtor[s]," Delmer M. and Gail E. Ackels. These bankruptcy proceedings did not discharge the obligations of Gold Dust Mines, a distinct legal entity. The superior court did not err in concluding that the bankruptcy did not discharge Gold Dust Mines' debts.

### D. The Superior Court Did Not Err In Concluding That Claims Staked By Del Ackels In 2003 Were Held In Constructive Trust For Little Squaw.

Gold Dust challenges the superior court's interpretation of the lease in the companion case, S–13909. It argues that the superior court improperly ruled "that Ackels was the agent of Little Squaw when he staked and filed his claims in 2003." Little Squaw again defends the superior court's interpretation of the lease. It argues that any claims Del staked during the holdover tenancy were staked on behalf of Little Squaw.

A constructive trust is an equitable remedy that becomes available upon clear and convincing proof that a party holds a property interest "by reason of unjust, unconscionable, or unlawful means."[43] In imposing a constructive trust, the court vests the ill-begotten property interest in the wronged party.[44] A constructive trust is an

appropriate remedy when a mining claim lessee stakes over claims that he is obligated to maintain for the lessor.[45] As noted above, in *Miscovich*, we held that a party agreeing to perform annual assessment work cannot, by relocating the claim after failing to do the work, "acquire any interest adverse to that of the prior claimant."[46] In the present case, the superior court was guided not only by the equitable principles of *Miscovich*, but by Del's own testimony about the terms of the lease between Gold Dust and Little Squaw. At trial Del testified that any claims he staked under the operation of the lease would have been staked for Little Squaw. On this basis, the superior court concluded that claims Del staked during the holdover tenancy were held in constructive trust for Little Squaw. We find no error.

### E. The Superior Court Did Not Err In Ruling On The Frustration Of Purpose Contract Defense.

Gold Dust also seems to argue that the lease could not have been in operation under the doctrine of frustration of purpose. At trial it proposed a jury instruction on frustration of purpose, which the superior court declined to use. Little Squaw maintains that Gold Dust failed to object to the ruling on frustration of purpose and argues that the court correctly instructed the jury.

We have recognized "frustration or supervening impossibility" as a defense to enforcement of a contract.[47] Under this defense, performance is excused if, without fault of either party, an implied condition of the contract is not met.[48] Frustration of

**42.** *Marine Solution Servs., Inc. v. Horton*, 70 P.3d 393, 401 (Alaska 2003) ("It is well-established that the corporate entity is distinct although all or a majority of its stock is owned by a single individual or corporation, or although the corporation is a so-called 'family' or 'close' corporation.") (internal citations omitted).

**43.** *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska 2003) (quoting *McKnight v. Rice, Hoppner, Brown, & Brunner*, 678 P.2d 1330, 1335 (Alaska 1984)). We further explained that "a constructive trust presupposes a transfer or holding of property in which the equitable beneficiary has a legal interest and unconscionable conduct by the property's holder in connection with its acquisition." *Id.*

**44.** *McKnight*, 678 P.2d at 1335.

**45.** *Miscovich v. Tryck*, 875 P.2d 1293, 1299 (Alaska 1994).

**46.** *Id.* (citing 2 AMERICAN LAW OF MINING, § 38.03[4]).

**47.** *Merl F. Thomas Sons, Inc. v. State*, 396 P.2d 76, 79 (Alaska 1964).

**48.** *Id.* at 78 ("[W]here parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued

purpose is applicable where "parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and *neither agrees to be responsible for its continued existence and availability.*" [49]

■ In the present case, neither party suggests that maintaining the validity of the claims was outside the scope of the parties' agreement. In fact, each party asserts that the other failed to satisfy an obligation related to maintaining the premises. Thus, the doctrine of frustration of purpose does not apply here. We reject Gold Dust's argument that the lease was ineffective under the frustration of purpose doctrine.

### F. The Superior Court Did Not Err In Applying The Ten–Year Statute Of Limitations To Little Squaw's Claims Of Best Title To The Mining Claims Staked And Filed During The Lease.

Gold Dust argues that Little Squaw's claim of best title to the mining claims staked in 2003 is a "bootstrap argument" that depends on the operation of the lease at the time the claims were staked. According to Gold Dust, the three-year statute of limitations for contracts bars Little Squaw from asserting best title to the mining claims staked in 2003 because Little Squaw filed suit in February 2007, three years and four months after the lease was terminated.

Little Squaw defends the superior court's decision to apply the ten-year statute of limitations for actions involving title to real prop-

erty. It argues that the statute of limitations for contracts does not apply because Little Squaw "was not seeking any damages for the non-payment of rents or royalties during the lease, or the failure to do any act required under the lease."

■ In determining which statute of limitations applies, we look to "the nature of the injury alleged, rather than to the technical cause of action." [50] We have also "expressed a policy of applying the longer of two limitations periods if two limitations statutes apply to a claim." [51] In this case, we must decide between the three-year statute of limitations that applies to contract actions [52] and the ten-year statute of limitations that applies to actions to recover real property. [53]

■ Had Little Squaw sought contract damages, Gold Dust's argument that the statute of limitations has expired would be appropriate. But the remedy Little Squaw seeks is title to its mining claims, not breach-of-contract damages. While the leading issues changed over the course of the litigation, the claims Little Squaw pursued at trial and continues to defend on appeal are aptly characterized as claims seeking best title to the disputed mining claims. Under our precedent, the superior court's decision to apply the ten-year statute of limitations to these claims was proper.

In addition, we find no error in the superior court's decision to award Little Squaw damages for trespass, a claim that is subject to a six-year statute of limitations that has

existence and availability, the contract must be regarded as subject to an implied condition that if, without the fault of either party, the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.") (quoting *Parrish v. Stratton Cripple Creek Mining & Dev. Co.*, 116 F.2d 207, 209–10 (10th Cir.1940), *cert. denied*, 312 U.S. 698, 61 S.Ct. 738, 85 L.Ed. 1132 (1941)).

**49.** *Parrish*, 116 F.2d at 209–10 (emphasis added).

**50.** *McDowell v. State*, 957 P.2d 965, 968 (Alaska 1998) (applying six-year statute of limitations for trespass rather than two-year statute of limitations for torts).

**51.** *Id.*

**52.** AS 09.10.053.

**53.** AS 09.10.030. This provision also suggests that there may be no statute of limitations for actions to quiet title. AS 09.10.030 ("An action may be brought at any time ... in order to (1) quiet title to [ ] real property; (2) eject a person from that real property."). Little Squaw's claims would not be barred under any of these provisions, and this court does not need to determine which of these provisions applies to Little Squaw's claims.

not expired.[54] Because no damages were awarded for conversion of gold, we need not consider whether the proper statute of limitations was applied to that claim.

### G. The Superior Court's Ruling On The Department Of Natural Resources' November 11 Determination Is Not Reversible Error.

Gold Dust argues that the superior court improperly deferred to the 2008 adjudication of the mining claims by the Department of Natural Resources, which determined that four Amended Location Notices filed by Del were invalid. According to Gold Dust, the decision was "issued without statutory authority, without notice, or an opportunity to offer evidence or argument, was not the result of a procedure that provided due process and was issued after at least two ex parte communications with Little Squaw." Gold Dust further argues that the particular employee who issued the adjudication in this case was not authorized to do so, that the opportunity for administrative appeal of Department of Natural Resources decisions is inadequate to remedy the injuries of an improper adjudication, and that Little Squaw was not required to comply with the same administrative requirements as Gold Dust.

Little Squaw contends that the superior court reasonably and justifiably relied on the Department of Natural Resources' adjudication of the Ackeleses' amendments to their mining claim location notices.

Alaska mining statutes authorize the commissioner of the Department of Natural Resources to oversee the implementation of the Alaska Land Act.[55] This includes the authority to adjudicate disputed mining-claim amendments, which must be recorded with the Department.[56] The commissioner may delegate this authority to Department employees as "necessary to carry out the provisions and objectives" of the governing statute.[57] Although these adjudications are not governed by the Alaska Administrative Procedures Act,[58] the Department's authority is constrained by constitutional and statutory requirements, as well as by the Department's own regulations and judicial review.[59]

In this case, the Department of Natural Resources issued a letter on November 11, 2008, which concluded that four mining-claim amendments filed by Del were invalid on the ground that they overlapped with Little Squaw's existing claims.[60] It is clear from

54. AS 09.10.050.

55. AS 38.05.020.

56. AS 38.05.195–.200; *see also Chalovich v. State, Dep't of Natural Res.*, 104 P.3d 125, 130 (Alaska 2004) (concluding AS 38.05.210 authorizes the Department of Natural Resources to define the labor year for mining claims); *Moore v. State, Dep't of Natural Res.*, 992 P.2d 576, 581 (Alaska 1999) ("Because the commissioner, acting within his authority, was entitled to find that PRI was ... not qualified to acquire mining rights under AS 38.05.190(a), his decision voids and nullifies PRI's mining rights."); *AU Intern., Inc. v. State, Dep't of Natural Res.*, 971 P.2d 1034, 1041 (Alaska 1999) (rejecting due process challenge to Department's determination that 1,035 mining claims were abandoned by failure to properly file affidavit of annual labor).

57. AS 38.05.020(b)(4).

58. *See* AS 44.62.330(a) (listing agencies subject to the procedural requirements of AS 44.62.330–.630); AS 38.05.020 (subjecting regulations, but not adjudications, of the Department of Natural Resources to the requirements of the Administrative Procedure Act).

59. *See, e.g.,* AS 38.05.020(b)(1) (requiring that procedures established by the commissioner be "reasonable [and] ... necessary to carry out" the statutory mandate); *Moore v. State*, 553 P.2d 8, 31 (Alaska 1976) (Rabinowitz, J., concurring) (concluding "our courts can review the performance of administrative tasks by an executive agent to ensure compliance with specific procedural safeguards imposed by the legislature in accordance with Alaska's constitutional mandates"); *see also id.* at 30 (requiring compliance with separate opinion of Justice Rabinowitz).

60. The November 11 letter replaced a letter issued by the Department of Natural Resources on October 29, 2009. The conclusions in both letters are the same and much of the language in the letters is identical. The only difference between the letters is that the November 11 letter includes additional information that helps to identify the claims in dispute (ADL numbers, MTRSC locations, document numbers). To avoid confusion, we follow the superior court's practice of referring to this as the "November 11" letter.

the face of the November 11 letter that ex parte contacts with Little Squaw's president, Dick Walters, prompted the Department's adjudication of the amendments in question. These ex parte contacts and the timing of this letter—issued just over three weeks before trial, more than three years after Del's amendments were filed—raise serious doubts about the fairness and adequacy of the Department's process for adjudicating mining-claim disputes. Furthermore, we share Gold Dust's concern that deference by the superior court to the adjudication in these unusual circumstances would have been misplaced. But the superior court here did not defer to the administrative agency.

As to the first of the four claims in question, GDM 17, Gold Dust's opening brief states:

> The court ruled this letter was a decision of an administrative agency and adopted its findings before trial began, by "directed verdict," ... and told Ackels his remedy was an administrative appeal. This took GDM # 17 from Ackels and removed Ackels'[s] claim to it from the trial.

But the superior court did not, in fact, remove ownership of GDM 17 from the issues to be resolved at trial. The court specifically stated, "we'll still go forward with 17 and we'll see how that shakes out." The parties presented evidence about GDM 17, and halfway through the trial, the court reiterated its understanding that ownership of GDM 17 remained an issue in dispute. On the special verdict form, the jury specifically found that Del had not satisfied the statutory requirements for staking and recording that claim. On the basis of the jury verdict, the superior court granted Little Squaw title to GDM 17. Because title to GDM 17 was litigated at the trial and properly submitted to the jury, we find no error in the superior court's decision to award this claim to Little Squaw.

■ As to the three other parcels that were the subject of the DNR letter—LS0 4,

GDM 1, and GDM 2—Gold Dust was given the opportunity at the outset of trial to contest the correctness of the agency decision. It indicated that it was not at that time in a position to do so. The superior court, noting that "[n]ow's the time [for trial]," then stated that "those [parcels] are not a matter for trial," and that Gold Dust would have to appeal the agency decision if it believed the decision to be flawed. It is true that the time between the agency decision and the start of trial was short. But Little Squaw—faced with the same time limitation—had investigated and was prepared to present evidence supporting the agency decision, while Gold Dust admitted that it was "not in a position to contest." And Gold Dust did not seek a continuance of trial (to allow it either to present evidence at trial or to appeal the DNR's administrative decision). In these circumstances, the superior court's decision to allow the uncontested decisions of the agency to stand [61] was not error.[62]

### H. The Superior Court Did Not Err In Attributing Excess Labor Performed By Del In 1999 To Little Squaw.

Gold Dust challenges the superior court's ruling that Little Squaw could use excess labor performed by Del in 1999 in order to satisfy its statutory labor requirements in subsequent years. Gold Dust argues that when Little Squaw abandoned 86 of its mining claims around 2000, Little Squaw's remaining 26 claims were no longer adjacent to or in common ownership with the claims on which labor had been performed. According to Gold Dust, Little Squaw was not entitled to carry forward excess labor that had been performed on abandoned claims. Gold Dust may also be arguing, as it did at trial, that because the affidavit submitted in 1999 did not specifically state that excess labor would be carried forward, Little Squaw was barred from applying the excess $96,000 of labor to future years.

---

**61.** Judge Olsen noted that Gold Dust had the right to appeal the DNR decision if it believed it to be erroneous. The record before us shows no such administrative appeal.

**62.** We also note that evidence at trial suggested that these three claims (LSO 4, GDM 1, and GDM 2) overlapped with claims that Del mined under Gold Dust Mines' lease with Little Squaw, including Upper Discovery and Number Two Above Discovery. If the claims overlap, the Department's administrative decision with respect to them was correct.

Little Squaw defends the superior court's ruling. It argues that Del was equitably estopped from relying on deficiencies in the affidavit of labor that he submitted in 1999 because both he and Little Squaw believed that the claims on which Del performed labor were part of a common claim group. Further, Little Squaw argues that labor performed outside the boundaries of the mining location may qualify as annual labor if it develops or benefits the location.

■ As noted above, AS 38.05.210 requires annual labor be performed "on or for the benefit or development of each mining claim." If adjacent claims are held in common, labor performed on any of the claims may satisfy the statutory labor requirement for the other claims.[63] Excess labor performed in a given year may be carried forward for up to four years.[64] The owners of these mineral rights must submit annually to the Department of Natural Resources affidavits attesting to the work performed on their claims.[65] In *Ashbrook v. O'Harra*,[66] we held that a former mining claim lessee was equitably estopped from challenging the accuracy of affidavits of labor that he submitted on behalf of the lessor.[67] The superior court applied the same rule in this case. We find no error.

■ Insofar as Gold Dust argues that Little Squaw cannot carry forward excess labor because it did not state its intention to carry forward the excess in 1999, we reject that argument. Excess labor can be carried forward even where the affidavits submitted do not include "an express statement that excess labor will be carried over."[68]

## I. The Superior Court Did Not Err In Awarding Little Squaw Title To GDM 16.

Gold Dust argues that the superior court's decision to grant Little Squaw title to GDM

16 constitutes legal error because this mining claim was neither pleaded in the complaint nor tried before the jury. Little Squaw responds that GDM 16 was properly granted to Little Squaw because this claim "was both pled by Little Squaw in its Complaint and by the Ackels in their Counterclaim, and was actively litigated by both parties at trial."

We have recognized that issues not raised in the pleadings may be tried by implied consent of the parties.[69] These issues "shall be treated in all respects as if they had been raised in the pleadings."[70]

■ Although GDM 16 was not specifically pleaded in the complaint, that document did seek "a court order imposing a constructive trust in favor of Little Squaw on the claims asserted by [Gold Dust]." This appears to refer to all claims staked by Gold Dust, including GDM 16. In addition, Gold Dust sought to quiet title to GDM 16 in its counterclaims. The court heard evidence about Del's compliance with the statutory requirements for staking GDM 16, and Gold Dust's attorney did not object to the admission of the location notice for GDM 16. Later, the attorney voiced concerns about submitting claims to the jury that were not in dispute, but after some discussion with the court, both parties agreed to an open-ended jury instruction, which allowed the jury to list GDM 16 as an improperly staked claim. On the basis of this jury finding, the superior court granted Little Squaw title to GDM 16. Because this claim was both generally covered in the pleadings and specifically tried by consent, we find no error in the superior court's decision to award it to Little Squaw.

## J. The Superior Court Did Not Err In Ejecting Del From Little Squaw's Mining Claims.

Gold Dust challenges the superior court's post-trial ejectment order. It argues that

63. AS 38.05.210.

64. 11 AAC 86.220(c).

65. *Id.*

66. 581 P.2d 218 (Alaska 1978).

67. *Id.* at 221.

68. *Ashbrook,* 581 P.2d at 220.

69. *E.g., Bevins v. Ballard,* 655 P.2d 757, 761 (Alaska 1982).

70. Alaska R. Civ. P. 15(b).

the superior court improperly "merged the surface estate into the mineral estate" when it ordered Del off the surface of Little Squaw's claims. According to Gold Dust, the superior court interfered with the Department of Natural Resources' permitting process and lacked the authority to do so.[71]

Little Squaw defends the superior court's ejectment order. Little Squaw argues that it was entitled to an ejectment order restoring its possession of the disputed mining claims and that Del continued to interfere with Little Squaw's property rights even after the superior court awarded Little Squaw title to the disputed claims.

■ Under Alaska law, a person who acquires mining rights to located claims also has rights to make use of the corresponding surface estate as "necessary for the prospecting for, extraction of, or basic processing of minerals."[72] The mining claimant's rights are "subject to reasonable concurrent uses."[73] We recognized in *Shope v. Sims*[74] that the holder of a mining claim may have a claim for ejectment under AS 09.45.630.[75] The same holds true today; a mining claimant may recover possession of property by showing that he has the right to possession of the claim from which he has been improperly ousted.[76]

Following the trial in this case, Del applied for a five-year mining permit to mine claims located at Township 31, Range 3 West, Sections 10, 15, and 16. He traveled to those claims in March 2009 while the superior court's resolution of the issues litigated at trial was still pending. While Del was in transit, the superior court issued written findings and conclusions which stated:

> Based on the conclusion that [Little Squaw] is the holder of best title to its mining claims No.2 Above Discovery on Little Squaw Creek and Star East Fraction, Golden Eagle Fraction, Upper Discovery, and No.5 Below Upper Discovery on Big Creek as well as those claims staked by [the Ackelses] in July 2003, LSQ #2–#4 and GDM #1–#17, [Little Squaw] is entitled to an order ejecting [the Ackelses] from those claims and [Little Squaw]'s structures on those mining claims, specifically including, but not limited to, vacating and removing all their personal property from the cabin, tool shed, and all other structures on No.5 Below Upper Discovery. [The Ackelses] must make prior arrangements with [Little Squaw] for the removal of their personal property from [Little Squaw]'s property, the court recognizing that [the Ackelses], along with the public in general, retain the right to use the airstrips on [Little Squaw]'s mining claims, and has access across the surface of the claims.

Following the entry of this judgment, Del applied for another permit to mine GDM 18. In July 2009, Del traveled to these claims to begin mining them for the season. As addressed further below, the parties disagree about whether Del's July 2009 mining activity took place within the boundaries of Little Squaw's mining claims. On July 29, 2009, the superior court issued an Order in Aid of Final Judgment, which ordered Del off all of Little Squaw's mining claims. Following his

---

71. Gold Dust frames this as a question of subject matter jurisdiction, arguing that the superior court did not have "jurisdiction" over the surface estate, which belongs to the State of Alaska. This is misguided. "The superior court is the trial court of general jurisdiction...." AS 22.10.020. Gold Dust does not argue that the superior court is barred from resolving disputes about the surface estate of mining claims.

Nor does Gold Dust advance a valid personal jurisdiction argument. Gold Dust suggests that the court should not have issued an order affecting the surface estate because the state, which retains rights to the surface, was not named a party. This argument sounds in personal jurisdiction, but it is unavailing. As Little Squaw points out, the superior court resolved the dispute between Little Squaw, Gold Dust Mines, and Del, over whom the court "undeniably" had personal jurisdiction.

72. AS 38.05.255.

73. *Id.; see also Parker v. Alaska Power Auth.*, 913 P.2d 1089, 1091 (Alaska 1996) ("The State, as the owner of the surface estate, is permitted to convey all or part of its interest to other parties and it has done so in this case....").

74. 658 P.2d 1336 (Alaska 1983).

75. *Id.* at 1339.

76. *Id.*

receipt of this order, Del stopped his mining activity.

Gold Dust seems to argue that the superior court's order ejecting Del from Little Squaw's claims was improper because it required him to vacate the surface of the mining claims. This argument fails. *Shope* makes clear that a court may order a trespasser to vacate a mining claim. Moreover, in this case, the superior court's ejectment order was not overly broad. The post-trial findings and conclusions recognized that Del, along with the public in general, may access the surface estate in ways that do not unlawfully or unreasonably interfere with Little Squaw's use of the claim. The later Order in Aid of Final Judgment was similarly limited to ejecting Del from Little Squaw's claims. We find no error in the superior court's ejectment orders.

### K. The Superior Court Did Not Err In Concluding That Del's 2009 Mining Activity Took Place Within The Boundaries Of Little Squaw's Mining Claims.

Gold Dust argues that Del's July 2009 mining took place within the boundaries of his claim GDM 18 and cannot support the post-judgment award of damages for reclamation costs. Gold Dust maintains that "there was no dispute over where Ackels was mining in 2009, (just over how to describe its location)." It argues that because the only evidence concerning where the GDM 18 stakes were placed was Del's testimony, there should be no dispute that the mining took place within the boundaries of GDM 18. According to Gold Dust, the location of the GDM 18 stakes (not the description in the GDM 18 Location Notices) controls the boundary determination. It insists that this question of law—whether the description of the claim controls over the physical placement of the claim stakes—resolves the appeal of the reclamation damages award.

By contrast, Little Squaw contends that "the issue is truly whether the trial court['s] finding [concerning the location of] ... Ackels's undisputed mining activities in 2009 ... was clearly erroneous." According to Little Squaw's expert witness, James C. Barker, Del's 2009 mining took place within the boundaries of Little Squaw's GRMC 14 and 15 and on open state land subsequently staked by Little Squaw as GRMC 30.

Gold Dust concedes that the 2009 mining activity took place where Barker identified it on photographs. Gold Dust does not specifically concede—nor specifically deny—that Del's 2009 mining took place in Township 31 North, Range 3 West, Sections 21 and 28, and it does not offer any definitive statement about where the 2009 mining took place in terms of GPS coordinates or township, range, and section coordinates. Instead, Gold Dust relies on Del's testimony that all his 2009 mining activity took place within the boundary marked by his GDM 18 stakes. The closest Del comes to locating his GDM 18 claim in geographic terms is his testimony that Barker identified the claim "much farther down the creek" than Del believed it to be. Gold Dust maintains that because Del had staked his claims 100 feet short, the corner posts of GDM 18 "would be quite far from the corners of the quarter-quarter section" listed on the Location Notice. Gold Dust's position that Del's 2009 mining took place within the boundaries of his claim GDM 18 depends on his testimony about the location of the GDM 18 stakes—testimony that the superior court specifically discredited.

Particular deference is due to the superior court's credibility determinations.[77] Even if we accept Gold Dust's legal argument that the physical location of the stakes controls over the description of the location,[78] that alone would not justify reversing the superior court's damages award. Reversing the superior court's damages award is justi-

---

**77.** *Wasserman v. Bartholomew,* 38 P.3d 1162, 1167 (Alaska 2002) (citing *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 20 P.3d 1130, 1136 (Alaska 2001)).

**78.** AS 38.05.195(b)(1) provides that, in the event of a conflict over boundaries for the quarter

section or quarter-quarter section, "the corners marked on the ground of a claim established in accordance with this paragraph and regulations of the commissioner control." Because this issue has not been briefed, we express no opinion on the interpretation of this statute.

fied only if Del had produced definitive evidence of the stake locations that refuted the information on the GDM 18 claim notice. But Gold Dust did not meet this burden.

Its evidence fell far short of being definitive. In fact, Del's testimony was riddled with gaps and inconsistencies about his use of GPS, the geographic location of the GDM 18 stakes, and his 2009 mining activity. Looking to the record, the superior court properly resolved a factual dispute about how far downstream the GDM 18 posts were placed. Its decision to discredit Del's testimony was reasonable and not clearly erroneous.

Gold Dust's arguments challenging this credibility determination are misguided. Gold Dust first argues that "there was no dispute on where [Del's] stakes were." But the portion of the transcript cited supports only the more limited proposition that Little Squaw did not dispute that GDM 16 and GDM 18 shared corner posts. As the cited portion of the transcript shows, Little Squaw did indeed dispute "where [the corner posts] are on the creek." And despite its argument that there is no dispute over the location of the corner posts, Gold Dust admits that Little Squaw's expert "located [Del's] GDM # 18 further downstream than where [Del] put his corner." Not only was Del's testimony about how he staked GDM 18 in relation to GDM 16, how he used the stakes of other claims and GPS technology to locate his GDM 18 stakes, and the dimensions of his claims insufficient to directly answer this factual question, but the superior court was under no obligation to credit his testimony.

 Gold Dust also argues that inconsistencies in Del's testimony might have resulted from "good faith confusion." But of course that does not obligate the superior court to credit the testimony. In making credibility determinations, the superior court is not limited to identifying deliberate misrepresentations. The superior court may refuse to credit testimony based on inaccuracies in a witness's ability to perceive or recall events. It was within the superior court's discretion in this case to determine wheth-

er—and on what grounds—to disbelieve Del's testimony.

 Finally, Gold Dust seems to argue that not every false statement is a lie and that any false statements made by Del were not "lies." It cites sample pattern jury instructions for the proposition that honest people may "forget or remember things incorrectly" and that "inconsistencies and contradictions in a witness' testimony . . . do not necessarily mean that you should disbelieve the witness." [79] But this argument does not justify reversing the superior court's credibility determination in this case. The superior court may overlook inconsistencies and contradictions in testimony where the weight of the evidence counsels the court to do so. And the superior court may focus on inconsistencies in testimony when the weight of the evidence so counsels. The superior court did the latter in this case, and Gold Dust offers no justification adequate to reverse this credibility determination. Because the superior court found no credible evidence that the GDM 18 stakes were placed outside their recorded location, the contention that Del mined GDM 18 fails.

### L. The Superior Court's Finding That Del Knew He Was On Little Squaw's Claim In 2009 Was Not Clearly Erroneous.

Gold Dust denies that Del stopped his summer 2009 mining activity because he knew he was on Little Squaw's claims and challenges the superior court's finding to that effect. It offers other reasons that Del stopped mining in 2009:(1) because he believed his mining permit had been invalidated, and (2) in order to retrieve equipment he had stored on another claim, Number Five Below Discovery.

Little Squaw defends the superior court's finding, noting that Del stopped mining claims after receiving an order ejecting him from Little Squaw's claims. Little Squaw argues that the order did not eject him from his own claims and if he had been mining his own claims, he would not have had to stop.

**79.** Alaska Civil Pattern Jury Instructions, 1.07 Credibility of Witnesses.

▇▇▇▇ We will not overturn a factual finding unless that finding is clearly erroneous.[80] The record in this case does not compel us to reverse the superior court's finding. Del testified that he halted his 2009 mining activity and began moving his equipment when he received an order stating that Gold Dust was ejected from Little Squaw's mining claims. This testimony is sufficient to support the superior court's finding that Del knew that he was on Little Squaw's land. We find no error.

## M. The Entry Of Judgment Against Gail Ackels For Reclamation Costs Caused By The 2009 Mining Activity Was In Error.

Gold Dust argues that Gail Ackels should not be liable for damages arising from the 2009 mining work, which the superior court concluded took place on Little Squaw's claims GRMC 14 and 15. It argues that even if Del is liable in damages for trespassing on Little Squaw's claims in 2009, Gail should be shielded from liability because her status as Del's wife and her status as a shareholder of Gold Dust Mines, Inc. are insufficient to support liability.

Little Squaw contends that Gail physically participated in the 2009 mining activity on GRMC 14 and 15 and can be held liable for any damages arising from that activity. It points to evidence suggesting that Gail was on the mining claims in 2009 and shared Del's financial interest in the development of the mining claims.

▇▇▇▇ In a civil case where multiple defendants are held liable, AS 09.17.080 instructs the fact-finder to make findings explaining "the percentage of the total fault that is allocated to each ... defendant."[81] This statute further instructs the court to "enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault."[82] Under this general rule, a defendant's liability is limited to its share of the comparative fault.[83] Because the superior court did not make the findings required by AS 09.17.080, we reverse the judgment against Gail and remand for consideration of such findings.

▇▇▇▇ Because the superior court did not enter comparative fault findings in accordance with AS 09.17.080, the superior court's decision to enter judgment against Gail may have been based on its ruling that Little Squaw was entitled to pierce Gold Dust's corporate veil. Shareholders of a corporation may be liable for corporate debts if the shareholders control the corporation and abuse the corporate structure to prejudice an opposing party.[84] "[T]he corporate veil may be pierced when a corporation is nothing more than a 'mere instrument' of a shareholder."[85] We have identified six primary factors to consider in imposing personal liability on the shareholder. In applying the mere instrumentality test, we ask whether

> (a) the shareholder sought to be charged owns all or most of the stock of the corporation; (b) the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) the corporation has grossly inadequate capital; (d) the shareholder uses the property of the corporation as his own; (e) the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; and (f) the formal legal requirements of the corporation are observed.[86]

"[These] factors help the fact-finder to decide whether the evidence favors piercing the

80. *See Miscovich v. Tryck*, 875 P.2d 1293, 1297 (Alaska 1994); *see also Commercial Recycling Ctr., Ltd. v. Hobbs Indus., Inc.*, 228 P.3d 93, 98 (Alaska 2010).

81. AS 09.17.080(a)(2).

82. AS 09.17.080(d).

83. *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1020 (Alaska 2007).

84. *See Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1171–72 (Alaska 1987) (upholding trial court's decision to pierce corporate veil).

85. *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1125 (Alaska 2009).

86. *Id.* at 1126.

veil." [87] It is not necessary for all six factors to be satisfied before imposing personal liability.[88] "[T]he primary consideration in determining whether to 'pierce the corporate veil' is whether the corporate form has been abused by the person sought to be charged." [89] The court's ruling authorized Little Squaw to seek judgment against Gold Dust's officers and sole shareholders, Del and Gail Ackels.

But the superior court did not analyze the veil-piercing factors on the record when it authorized Little Squaw to pierce the corporate veil. Nor did the superior court explain its decision to pierce the corporate veil in its written findings and conclusions. Because specific findings under the mere instrumentality test are needed to pierce the corporate veil,[90] we reverse the award of reclamation costs against Gail and remand for specific findings.

### N. Holding Gail Ackels Jointly Liable For The Attorney's Fees Award Was Error.

Gold Dust also challenges the superior court's decision to hold Gail Ackels jointly liable for the attorney's fees award in this case. It argues that Gail was not a party to the lease nor a guarantor on the lease and that her role as a shareholder of Gold Dust Mines does not justify holding her liable for the corporation's debts. Little Squaw defends the superior court's attorney's fees award.

This question implicates the veil-piercing doctrine discussed in Part IV.M. Because the superior court did not enter specific findings to justify its veil-piercing decision and did not apportion liability among the defendants, we reverse the award against Gail. We remand this issue for further consideration and entry of findings by the superior court.

### O. The Superior Court Did Not Err In Awarding Enhanced Attorney's Fees To Little Squaw.

Gold Dust challenges the superior court's decision to award enhanced attorney's fees to Little Squaw. It denies that Del engaged in unreasonable or bad faith conduct and argues that these aggravating factors do not justify the enhanced award in this case. Little Squaw contends that the enhanced fee award was proper based on the complexity of the case, length of the trial, and the "unreasonable claims and vexatious, even bad faith, conduct by the Ackels[es]."

■ Alaska Civil Rule 82 authorizes the superior court to award attorney's fees to the prevailing party in a civil case. The rule sets out a number of factors the court may consider in fashioning a fee award.[91] In this case, the superior court concluded that because Little Squaw secured title to the disputed mining claims, it was the prevailing party on the main issues in the litigation. The court awarded Little Squaw enhanced

87. *Id.*

88. *Nerox Power Sys., Inc. v. M–B Contracting Co.,* 54 P.3d 791, 802 (Alaska 2002) (affirming conclusion that companies were "mere instrumentalities" of shareholders where there was evidence of five of the six factors).

89. *Murat v. F/V Shelikof Strait,* 793 P.2d 69, 76 (Alaska 1990) ("[T]he primary consideration in determining whether to 'pierce the corporate veil' is whether the corporate form has been abused by the person sought to be charged."); *see also L.D.G.,* 211 P.3d at 1125 ("[T]he corporate veil may be pierced when a corporation is nothing more than a 'mere instrument' of a shareholder.").

90. *Murat,* 793 P.2d at 76–77.

91. These factors include: (A) the complexity of the litigation; (B) the length of trial; (C) the reasonableness of the attorneys' hourly rates and the number of hours expended; (D) the reasonableness of the number of attorneys used; (E) the attorneys' efforts to minimize fees; (F) the reasonableness of the claims and defenses pursued by each side; (G) vexatious or bad faith conduct; (H) the relationship between the amount of work performed and the significance of the matters at stake; (I) the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts; (J) the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party or its insurer; and (K) other equitable factors deemed relevant. If the court varies an award, the court shall explain the reasons for the variation. Alaska R. Civ. P. 82(b)(3).

attorney's fees in light of the complexity and length of the case, which was "made more complex by delays in discovery" by Gold Dust and Del's inconsistent testimony on key issues concerning the interpretation of the lease. According to the superior court, "[a]nother example of the unreasonableness of the claim, even bordering on bad faith, was [Del's] argument that because the affidavit of annual work he had filed on [Little Squaw]'s behalf was in fact defective, causing their claims to be void, that he was able to re-file in his own name." The superior court concluded that Little Squaw "incurred significantly higher attorney's fees than it should have if [the Ackelses] had pressed legitimate claims, founded on actual facts, [rather] than pursuing litigation with shifting facts and unreasonable arguments." The superior court's decision to award enhanced attorney's fees on the basis of these findings was not manifestly unreasonable. We find no error.

## V. CONCLUSION

For the reasons described above, we AFFIRM the superior court's decision to award Little Squaw title to the disputed mining claims and its resolution of the other issues raised at trial. Because specific findings are needed to pierce the corporate veil, we REVERSE the superior court's decisions to enter judgment and award attorney's fees against Gail Ackels and REMAND for further proceedings consistent with this opinion.

CHRISTEN, Justice, not participating.