*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KAREN GREENE, | ) | |
| | ) | Supreme Court No. S-14965 |
| Appellant, | ) | |
| | ) | Superior Court No. 4BE-11-00323 CI |
| v. | ) | |
| | ) | O P I N I O N |
| BEVERLY TINKER, | ) | |
| | ) | No. 6941 – August 15, 2014 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Charles W. Ray, Jr., Judge.

Appearances: Mark Lewis Nunn, Sr., Fairbanks, for Appellant. Myron Angstman, Angstman Law Office, Bethel, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, and Bolger, Justices. [Maassen, Justice, not participating.]

FABE, Chief Justice.

## I.     INTRODUCTION

A patient at a health clinic learned that a clinic employee, who was not authorized to access the patient's medical record, had discussed the patient's pregnancy with a clerical worker at the clinic. In a complaint to the employee's supervisor, the patient accused the clinic employee of breaching medical confidentiality.

Shortly afterward, the clinic operator fired the employee, citing a breach of confidentiality. The employee then sued the patient for defamation. The patient counterclaimed for invasion of privacy and abuse of process, the latter claim being based on the employee's filing and withdrawing an earlier petition for a protective order. At some point the clinic investigated the patient's complaint and determined that it was unsubstantiated. It was later revealed that the patient herself was the source of the employee's knowledge about the patient's pregnancy.

At trial the patient claimed that she had an absolute privilege to accuse the employee of breaching medical confidentiality. The superior court rejected that argument and determined that the patient had only a conditional privilege, and later instructed the jury accordingly. The superior court also denied the patient's motion for summary judgment and made several challenged evidentiary rulings.

After a three-day jury trial, the superior court granted a directed verdict on the patient's abuse-of-process counterclaim. The jury returned a verdict for the employee on her defamation claim, awarding one dollar in nominal damages; the jury rejected the patient's counterclaim of invasion of privacy. Finding the employee to be the prevailing party, the superior court awarded her partial attorney's fees.

The patient appeals the superior court's ruling on conditional privilege, its denial of her motion for summary judgment, and its evidentiary rulings. She also alleges errors in the superior court's jury instructions, in its decision to grant a directed verdict on her abuse-of-process counterclaim, and in its award of attorney's fees to the employee. She claims various violations of her state and federal constitutional rights.

We conclude that the superior court did not err in any of its legal or evidentiary rulings or in its instructions to the jury, and we therefore affirm the superior court in all respects.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Beverly Tinker and Karen Greene are from the community of Pilot Station. The two are distantly related. There is a history of animosity between Greene and Tinker and between their respective families.

In 2007 Tinker improperly accessed Greene's medical file at the Pilot Station Health Clinic, where Tinker was employed and where Greene was a patient. Tinker claimed she was merely looking up an appointment date for Greene and that she shared the appointment information with Rose Zacharof, a clerical worker at the clinic. According to Greene, Tinker was looking at the file because she was trying to discover medical information about Greene.

Greene filed a complaint about this incident with the clinic operator, the Yukon-Kuskokwim Health Corporation (YKHC). YKHC reprimanded Tinker and gave her the opportunity to participate in a "performance improvement program" addressing confidentiality requirements; the alternative was termination of her employment.[1] Following the incident, Greene requested that YKHC ensure that Tinker not have access to her medical records in future; YKHC explicitly directed Tinker never to look at Greene's records again.

In October 2009 William Schreiner, an official of YKHC, attended a meeting of the local tribal government, the Pilot Station Traditional Council, to address community concerns about breaches of confidentiality that had occurred at the Pilot Station Health Clinic. Greene insists that Schreiner was there to assuage concerns about Tinker specifically; the meeting minutes can be read as indicating this, but are somewhat

---

[1]    It appears that at some point there was a gap in Tinker's employment with YKHC and that Tinker was rehired in October 2009. However, it does not appear that Tinker was suspended or terminated as a result of the 2007 incident.

ambiguous. In any event, Schreiner promised the meeting attendees that any further breach of confidentiality would result in the termination of the staff member responsible.

The events leading to this case took place in the spring of 2011. At that time, Greene was in the early stages of pregnancy, as was Tinker's sister, Candace Heckman.[2] Greene visited the Pilot Station Health Clinic for prenatal care. According to Greene, at her first prenatal visit she asked a YKHC staff member to ensure that Tinker not learn of her pregnancy, and in particular that Tinker not learn of her due date. In addition to Greene's concerns about Tinker's unauthorized access to her medical file in 2007, Greene and her husband were especially solicitous of keeping Greene's pregnancy private because of a miscarriage that had occurred during the early stages of a previous pregnancy.

In March 2011, when Greene was approximately nine weeks pregnant, Rose Zacharof, the clinic clerical worker, informed Greene that on a recent day when Zacharof and Tinker were working alone at the clinic, Tinker had told Zacharof that Greene was pregnant and had remarked that Greene's due date was the same Heckman's. Greene was troubled that Tinker apparently knew her due date, believing that Tinker had learned the information by looking at Greene's medical file. Greene went to the clinic and confronted Tinker, asking Tinker how she knew of her pregnancy and due date. Tinker refused to speak with Greene about the issue and directed Greene to speak with her supervisor. According to Greene, Tinker's response — referring Greene to a supervisor rather than explaining how she had learned of Greene's pregnancy and due

---

[2]     Earlier in 2011, Greene and Heckman were engaged in a personal conflict of their own that resulted in a protective order being granted in favor of Heckman. According to Heckman's petition for the order, Greene was harassing Heckman at her workplace and making false reports to Heckman's employer that Heckman had a criminal background.

date — persuaded Greene that Tinker had learned the information at work. On March 25, 2011, Greene filed a second complaint with the clinic; she mentioned Tinker's confidentiality breach in 2007 and strongly implied that Tinker had now repeated that misconduct.

Tinker later testified that she did in fact speak with Zacharof about Greene's pregnancy and due date, but she denied that she ever looked at Greene's medical file after the 2007 incident. According to Tinker, the news of Greene's pregnancy and due date had reached her through a gossip chain that began with Greene herself. Tinker said she learned the information from her sister, Heckman, and that Heckman had heard it from Teresa Paukan, a mutual acquaintance of Tinker and Greene. Tinker's account, corroborated by Paukan at trial, was that in February 2011 Greene told Paukan that she was pregnant while Greene and Paukan were attending a basketball game in Pilot Station. After Paukan heard the news from Greene, Paukan shared it with Heckman, who was also at the basketball game; Heckman then told Tinker. The two sisters then discussed the possibility that Greene and Heckman might have the same due date, which they thought remarkable because Greene and Heckman had apparently given birth on the same date in 2009.[3]

Greene testified that she received no response to her March 25, 2011 complaint to YKHC and in early April 2011 decided to take the matter to the Pilot Station Traditional Council. Greene attended several meetings of the tribal council, which according to Tinker was dominated by members of Greene's extended family.

---

[3] It remains unclear how (or even whether) Heckman and Tinker knew Greene's due date. Paukan did not indicate in her testimony that Greene shared that information with her. Furthermore, Heckman specifically testified that when Paukan told her Greene was pregnant, Paukan did not tell her Greene's due date. It appears that Heckman surmised that because both she and Greene were in the early stages of pregnancy, their due dates would be similar.

Greene read a letter at one meeting in which she accused Tinker of breaching confidentiality. Others in attendance at one of the meetings spoke of similar concerns about Tinker. On April 26, 2011, the tribal administrator sent a letter to YKHC requesting a meeting with Schreiner to address these renewed allegations of breaches of confidentiality at the clinic.

In early May 2011 Tinker sought a protective order against Greene, claiming that Greene was stalking her. Tinker complained in her petition about Greene's confronting her at the clinic, about Greene's speaking about her at the tribal council, and about Greene's complaint to YKHC in 2007. According to Greene, Tinker sought this protective order to intimidate Greene and others in the community who might complain about breaches of confidentiality. Tinker, on the other hand, claimed that the protective order was necessary because Greene was damaging Tinker's professional reputation. A magistrate judge found probable cause that Greene had committed domestic violence[4] and granted Tinker an ex parte protective order on May 10, 2011. A hearing for a long-term protective order was scheduled, but Tinker withdrew her petition in early June in anticipation of filing the present lawsuit; it appears that the scheduled hearing did not take place.[5]

On June 27, 2011, YKHC terminated Tinker's employment, citing violation of patient confidentiality. Whether the violation of confidentiality alleged by Greene played a role in Tinker's termination is unclear, but it seems that the two events were

---

[4]    The magistrate judge apparently concluded that Greene and Tinker are "household members" for purposes of the domestic violence statute because they are third or fourth cousins.

[5]    The hearing was scheduled for May 23, 2011, and thus should have occurred by the time Tinker withdrew her petition in June, but according to Tinker the hearing did not occur.

unrelated. Tinker initially claimed that Greene's complaint was the cause of her firing; her discovery responses suggested that she believed she was discharged for that reason. But Tinker later withdrew that contention, evidently because she was actually fired for a breach of confidentiality relating to another patient. YKHC investigated Greene's complaint against Tinker and determined that the allegation was unsubstantiated. Some time later, YKHC deemed Tinker eligible to be rehired. Whether that change reflects Tinker's being cleared of any wrongdoing was disputed at trial.[6]

## B.    Proceedings

### 1.    Tinker's complaint and Greene's answer and counterclaims

On August 9, 2011, approximately six weeks after Tinker's termination by YKHC, Tinker filed a lawsuit against Greene for defamation and for intentional interference with contractual relations. In her complaint Tinker asserted that Greene's statements constituted defamation per se; Tinker also pleaded special damages for personal humiliation and for loss of income, among other things.[7] And Tinker claimed that Greene intentionally interfered with her employment at YKHC, alleging that Greene's statements were the cause of her termination. Tinker repeated the intentional-interference claim in other filings, but she later abandoned it.

In her answer Greene made two counterclaims. She claimed Tinker invaded her privacy by divulging her private medical information and that Tinker

---

[6]    It appears that as of the time of discovery, Tinker had not been reinstated, although during one pretrial conference Tinker's counsel suggested that Tinker was back at work.

[7]    Tinker's defamation claim was based entirely on Greene's complaint to the clinic operator. We therefore do not address Greene's potential liability for her comments to the tribal council.

committed abuse of process by seeking and then revoking the May 2011 protective order.[8]

Both parties sought damages, including punitive damages. Both also sought attorney's fees.

### a. Discovery

Discovery was contentious. Greene's first set of discovery requests included numerous questions to which Tinker objected. These included interrogatories requesting information about how many patients had died under Tinker's care; the identities of any such patients; and whether and how frequently Tinker used alcohol and marijuana. Tinker refused to answer these questions. Tinker responded to several of Greene's other, less inflammatory discovery requests evasively. When asked to admit that she had made unauthorized disclosures of confidential health records, Tinker responded that she did not know the meaning of the term "unauthorized disclosures." When asked to admit that Greene was entitled to voice her opinion about Tinker's conduct as a YKHC employee by submitting a complaint, Tinker declined to answer, objecting that the terms "voice," "opinion," and "complaint" were excessively vague. As we discuss below, Greene sought sanctions against Tinker in the superior court for what she viewed as inadequate discovery responses.

In addition to this early conflict over discovery, there was question whether Tinker's personnel file, as released to the superior court by YKHC for in camera review, was missing certain documents. Greene suggested that the file was missing her 2007 complaint against Tinker as well as additional complaints by other patients.

---

[8] At one stage Greene sought to re-frame her abuse-of-process claim as "malicious prosecution," a change to which Tinker strenuously objected and which Greene apparently withdrew.

### b.    Greene's motion for summary judgment

After receiving Tinker's discovery responses, Greene moved in April 2012 for summary judgment on Tinker's claims of defamation and intentional interference with contractual relations.  Greene argued to the superior court that she had a First Amendment right to complain about Tinker's revealing her due date on the ground that Tinker's alleged violations of medical confidentiality were a matter of public concern and were therefore absolutely privileged.  Greene also argued that Tinker's alleged non-compliance with discovery rules warranted granting summary judgment in favor of Greene or imposing sanctions against Tinker, including fact establishment.  The superior court denied Greene's motion for summary judgment, principally on the ground that there was a genuine factual issue about the truth of Greene's accusations.  It also rejected Greene's assertion that summary judgment was proper because Tinker's discovery responses were inadequate.  In its order on summary judgment, the superior court did not address Greene's claim that summary judgment was required because her complaint to YKHC was absolutely privileged.

### c.    The superior court's orders on conditional privilege and defamation per se

In a related order, the superior court explained its rejection of Greene's position that the alleged disclosures by Tinker were a matter of public concern and that she was therefore absolutely privileged to complain to YKHC.  The superior court determined that "one, two, or three instances of discussion in an arguably public forum such as the Pilot Station [Traditional] Council do not transmute one's complaints about a specific individual's actions into a public concern."  But the superior court concluded that Greene had a conditional privilege to make defamatory statements about Tinker.  The superior court ruled that Greene could argue to the jury that her complaints about

Tinker were within her conditional privilege; the jury would determine whether Greene had abused the privilege.

In an order on jury instructions, the superior court determined that it would not give the instruction, proposed by Tinker, that Greene's conduct could constitute defamation per se. Tinker filed a motion for reconsideration, and the superior court later gave a defamation-per-se instruction, the result being that Tinker was not required to prove actual damages as an element of her defamation claim.

### d. The superior court's orders on alleged prior unauthorized disclosures

Greene sought to call as witnesses several other Pilot Station residents to testify about alleged prior instances of Tinker's unauthorized disclosure of confidential medical information. Greene also sought to present testimony from Sheila Minock, who was Tinker's supervisor at the clinic. Greene claimed that Minock would tell the court that she had prepared documents related to complaints about Tinker that were absent from the personnel file delivered to the court. Greene explained to the superior court that the testimony from Minock and the other witnesses would supplement alleged written complaints that Greene claimed she would present relating to breaches of confidentiality by Tinker. Greene claimed this testimony would demonstrate that confidentiality breaches were a matter of public concern, affecting the question of Greene's privilege to complain.

Tinker filed a motion in limine to bar admission of any evidence that other patients at the clinic had complained about her conduct, arguing that any such evidence was merely bad-acts evidence and was thus impermissible under Alaska Evidence Rules 404(a)[9] and 404(b)(1).[10] The superior court granted Tinker's motion. Citing its

---

[9] Alaska Rule of Evidence 404(a) ("Character Evidence Generally") states
(continued...)

decision that Greene had a conditional privilege to complain, the superior court declared moot any argument by Greene based on the claim that Tinker's alleged misconduct was a matter of public concern.

The superior court also expressed concern that if it permitted other patients to testify about their prior complaints against Tinker, the nature of their medical issues might be revealed, causing them embarrassment and making the trial unmanageable. Greene, evidently attempting to allay the superior court's concern about the witnesses' privacy, sought a protective order to prevent any inquiry about the witnesses' medical information. The superior court denied the motion for a protective order, concluding that because it had determined that Greene had a conditional privilege to complain to YKHC about Tinker's alleged misconduct, there was no reason for the witnesses to be called.[11]

---

[9] (...continued)
that subject to enumerated exceptions, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion . . . ."

[10]  Alaska Rule of Evidence 404(b)(1) ("Other Crimes, Wrongs, or Acts") states:

> Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[11]  When the superior court examined the written complaints, it discovered that they did not relate at all to unauthorized disclosures of medical information by Tinker. One complaint related to alleged unfriendliness by Tinker toward another parent in connection with an incident of bullying between children at a school, and the other complaint was about Tinker's husband, not Tinker.

### e. Greene's motion to preclude the testimony of Teresa Paukan

In August 2012, shortly before trial was to begin, Greene filed a motion to preclude the testimony of Teresa Paukan, whom Tinker had identified as a witness who could explain how Tinker learned Greene was pregnant. Greene pointed out that Tinker had identified Paukan as a witness several weeks after the close of discovery.[12] Greene argued that allowing Paukan as a witness would be inequitable and would create additional litigation costs for Greene. Greene also repeated the argument she raised at the summary judgment stage that Tinker's conduct in discovery was so "egregious" that the superior court should impose the sanction of fact establishment or should grant summary judgment for Greene. In her motion to preclude, Greene also sought to bar evidence of Tinker's being cleared to be rehired by YKHC, including a printed email bearing a notation that seemed to indicate Tinker's renewed eligibility for employment there.[13]

The superior court denied Greene's motion to preclude, concluding that the prejudice to Tinker that would result from excluding Paukan's testimony and the other evidence Greene sought to exclude "substantially outweigh[ed] the gravity of the late disclosure." The superior court also observed that in the several weeks since Tinker had disclosed Paukan, Greene had made no effort to depose Paukan, despite the fact that

---

[12] Discovery closed on June 14, 2012. Tinker identified Paukan on July 10, 2012. It is not clear why Tinker identified Paukan so late, as Paukan testified at trial that Tinker's sister, Candace Heckman, contacted her as early as February 2012 to request that she write a letter explaining her role in communicating the information about Greene's pregnancy.

[13] The email is a short message from Tinker to a YKHC staff member requesting reconsideration for employment. A handwritten note on the message reads "eligibility for rehire approved" and bears a date in 2012.

Greene knew Paukan and the two lived in the same village. The superior court also remarked on the acceptability and relatively low cost of telephonic depositions, and noted that Greene's counsel had declined on record to depose Paukan when he was offered the opportunity.

**f.     The trial, directed verdict, and jury instructions**

A jury trial of Tinker's defamation claim and Greene's counterclaims of invasion of privacy and abuse of process took place August 22-24, 2012. Both parties were represented by counsel.

During trial Greene sought to present the testimony of her aunt, Palassa Beans, who served as the president of the Pilot Station Traditional Council and was also Greene's work supervisor. Greene indicated that Beans would testify that Tinker was harassing Greene around the time Tinker sought the protective order against Greene.[14] Greene argued that Beans's testimony was important evidence for Greene's abuse-of-process counterclaim because it showed that Tinker had an improper purpose in seeking the protective order; that is, that the protective order was part of a pattern of harassment intended to "punish [Greene] for making the complaint with YKHC." The superior court, evidently persuaded by Tinker's view that Beans's testimony would be unjustified bad-acts evidence, did not permit Beans to testify.

At the conclusion of trial, Tinker moved for a directed verdict on Greene's abuse-of-process counterclaim. The superior court granted Tinker's motion on the ground that mere withdrawal of a petition in the ordinary course of litigation could not be the basis for an abuse-of-process claim.

---

[14]     The alleged harassment included Tinker doing "staredowns" of Greene, following Greene in a truck, and making false complaints to Beans about Greene.

Following the grant of a directed verdict on Greene's abuse-of-process claim, the superior court instructed the jury on several issues. In line with its earlier order on conditional privilege, the superior court instructed the jury that Greene "may be entitled to protection [from liability for a false statement] because an employer is entitled to know about a potential breach of patient confidentiality." The instruction indicated Greene abused the privilege if she "published the defamatory statement for some purpose other than for which the privilege is given; or . . . she knew the statement was false or entertained serious doubts about [its truth]."

In line with its decision to reverse its earlier determination on the issue of defamation per se, the superior court gave a defamation instruction that did not require Tinker to prove actual damages. The superior court directed the jury to award Tinker nominal damages of one dollar if it found that Greene had defamed her.

### g. The jury verdict

The jury returned a special verdict in favor of Tinker on both Tinker's defamation claim and Greene's invasion-of-privacy counterclaim. Specifically, the jury found that Greene had falsely accused Tinker of accessing Greene's medical records and that Greene had abused her conditional privilege to complain to Tinker's employer about Tinker's alleged misconduct. In line with the superior court's instruction on damages, the jury awarded Tinker one dollar in nominal damages.

The jury found that Tinker was not liable on Greene's counterclaim of invasion of privacy and so awarded Greene no damages.

### h. Award of attorney's fees to Tinker

Both parties moved for costs and attorney's fees. Noting that Tinker prevailed on her main claim and also defeated Greene's counterclaims, the superior court found Tinker to be the prevailing party and awarded her $12,015 in Alaska Civil Rule 82 attorney's fees.

In its order awarding fees to Tinker, the superior court rejected Greene's argument that attorney's fees were unwarranted because Tinker's decision to seek only nominal damages showed that her defamation claim was frivolous. The superior court noted that the jury's finding that Greene had in fact defamed Tinker negated this argument. The superior court also rejected Greene's argument that Tinker should not be awarded attorney's fees because she had made a bad-faith decision not to pursue the claim of intentional interference with contractual relations. The superior court determined instead that Tinker's decision to drop that claim was a legitimate tactical trial decision that Tinker made after she concluded that she faced a difficult evidentiary challenge in proving economic damages, and after she considered the possibility that extending the length of trial further might alienate the jury.

The superior court accepted Tinker's counsel's accounting of the time he had spent working on the case and rejected Greene's argument that Tinker's counsel should have indicated more specifically how much time he had allocated to each claim. The superior court noted that "a trial court need not make a claim-by-claim analysis in order to award a percentage of the total fees incurred."

The superior court took Greene's attorney to task over his motions and pleadings, which the superior court viewed as "lack[ing] focus" and "fraught with assertions and allegations of fact . . . not supported by admissible evidence." The superior court noted that it was "particularly distressed by the tenor of remarks by Greene's counsel [in his cross-motions for attorney's fees] that are of a highly personal nature but as to which there is no evidence."[15] It criticized what it viewed as Greene's

---

[15] The superior court seems to have been referring to accusations by Greene's counsel that Tinker's counsel had called him a "liar," told him he was "full of bullsh-t," shaken his finger in Greene's counsel's face, and suggested Greene's counsel had

(continued...)

attorney's "inapposite constitutional arguments," "disjointed and legally unsupported jury instructions," "repetitive, circuitous pleadings," and "trial tactics that consumed far more time than was warranted by the complexities and real issues in the case." Nevertheless, the superior court rejected Tinker's request for enhanced attorney's fees, finding itself "unable to attribute the foregoing conduct to Greene herself, as opposed to counsel."

## III. STANDARDS OF REVIEW

We review rulings on motions for summary judgment de novo, "reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor."[16] Summary judgment is proper "only if there is no genuine issue of material fact and if the party is entitled to judgment as a matter of law."[17] We review questions of constitutional law de novo.[18]

We review the superior court's decision to admit or exclude evidence for an abuse of discretion.[19] An abuse of discretion is found when we are "left with a definite and firm conviction that an error has been made."[20] We will reverse an erroneous decision regarding admissibility of evidence only if the decision "affected the

---

[15](...continued)
committed malpractice.

[16]     *Lum v. Koles*, 314 P.3d 546, 552 (Alaska 2013).

[17]     *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014).

[18]     *Anchorage v. Sandberg*, 861 P.2d 554, 557 (Alaska 1993).

[19]     *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 349 (Alaska 2012).

[20]     *Id.*

substantial rights of a party."[21] "The correct scope or interpretation of a rule of evidence creates a question of law 'to which this court applies its independent judgment, adopting the rule most persuasive in light of reason, precedent and policy.' "[22]

"An error in jury instructions will be grounds for reversal only if it caused prejudice."[23] "[P]rejudice exists 'if it can be said that the verdict may have been different had the erroneous instruction not been given.' "[24]

We review a directed verdict by inquiring "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors."[25] "[S]uch motions should be scrutinized under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution . . . . If there is any doubt, questions of fact should be submitted to the jury."[26]

"Attorney fee awards are reviewed for abuse of discretion. We will not reverse an award unless it is 'manifestly unreasonable.' "[27]

---

[21] *Id.*

[22] *City of Bethel v. Peters*, 97 P.3d 822, 825 (Alaska 2004) (citation omitted).

[23] *State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 59 (Alaska 2000).

[24] *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002) (citation omitted).

[25] *Taylor v. Wells Fargo Home Mortg.*, 301 P.3d 182, 191 (Alaska 2013).

[26] *Id.* (omission in original).

[27] *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 157 (Alaska 2012) (citation omitted).

## IV. DISCUSSION

Before we address the merits of Greene's arguments, we make a procedural note made necessary by the way Greene framed her arguments to the superior court, the organization of the superior court's orders responding to those arguments, and the way Greene now frames her arguments on appeal.

Greene argued to the superior court that summary judgment was proper because her constitutional rights to free speech provided an absolute defense to Tinker's defamation claim; because of the absence of disputed facts; and because Tinker's discovery responses were inadequate. The superior court addressed the latter two arguments in its order denying summary judgment, but it addressed the constitutional argument in a separate order on jury instructions and in another on conditional privilege. Greene structures her arguments on appeal in the same way she did at trial, including all of them in a generalized challenge to the superior court's denial of her motion for summary judgment.

Because the superior court did not address Greene's privilege argument in its order denying summary judgment, we understand her argument as challenging the merits of the superior court's separate orders on privilege and on jury instructions; as we discuss below, there was no error in these orders.

Orders denying summary judgment on factual grounds are generally unreviewable on appeal after a trial on the merits; on the other hand, we have reviewed denials of summary judgment after a trial on the merits "when the order was entered on a legal ground that affected the subsequent trial."[28] Here the superior court denied Greene's motion for summary judgment principally on the ground that there were

_____

[28] *See ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 133 n.66 (Alaska 2014) (citing *Larson v. Benediktsson*, 152 P.3d 1159, 1169 (Alaska 2007)).

disputed issues of fact relating to the truth of Greene's accusation. Greene challenges that ruling on the basis that there were no such issues, repeating her claim that summary judgment was proper "because all [Tinker] had were conclusory allegations." But this is precisely the type of challenge to a denial of summary judgment that we do not address after a trial on the merits,[29] and thus we do not address it here.

The superior court's other basis for denying summary judgment was purely legal. Addressing Greene's argument that summary judgment was proper because of Tinker's alleged discovery violations, the superior court ruled that summary judgment was simply not the proper mechanism to address perceived inadequacies in discovery responses. Greene repeats the same argument on appeal, and because the superior court's denial of summary judgment on this ground did not depend on the existence of disputed facts, we address that argument here.[30] As we explain below, the superior court also properly denied summary judgment on this basis.

A. **The Superior Did Not Err In Concluding That Greene Had No Absolute Defense To Defamation But Instead Had Only A Conditional Privilege To Complain to YKHC.**

Greene argues on appeal that the superior court erred in concluding that she had only a conditional privilege to complain about Tinker to YKHC, claiming that the guarantees of freedom of speech in the federal and Alaska constitutions provide a complete defense to Tinker's defamation claim.[31] As we explain below, the U.S.

---

[29] *Id.*

[30] *Id.*

[31] The elements of defamation are: "(1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) either per se actionability or special damages." *State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007).

Constitution privileges defamatory statements in certain contexts, and our precedents establish a similar privilege under Alaska defamation law. But on the facts before us here, Greene's privilege is only conditional — not absolute.[32] There was no error in the superior court's ruling on conditional privilege, nor was there in the superior court's jury instructions.

> **1.    On the facts of this case, the First Amendment provides at most a conditional privilege to complain to YKHC.**

Greene argues that her complaint to YKHC related to a matter of public concern, and that the First Amendment to the U.S. Constitution[33] provides absolute constitutional protection for such speech. But Greene's argument finds no support in the case law.[34]

We begin our discussion of this issue with a brief summary of the evolving relationship between common-law defamation actions and the relevant constitutional protections of free speech. At common law a defamatory statement was made at the peril

---

[32]    Absolute privileges to defame do exist in a variety of contexts, but this is not one of them. *See* RESTATEMENT (SECOND) OF TORTS (1977) §§ 585-592A (describing privileges generally accorded to parties to judicial proceedings, legislators, and executive and administrative officers, among others).

[33]    "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

[34]    In connection with the defamation claim, Greene at one stage took the position that the Pilot Station Traditional Council was a public forum, and that accordingly any sanction imposed on Greene because of her comments to the tribal council would be subject to strict scrutiny. We do not address that argument here; Greene appears to have abandoned it at some point, and in any event the argument is ill-founded, given that Tinker's defamation claim was based entirely on Greene's complaint to YKHC.

of the person making it; although a conditional privilege protected defendants in some circumstances, a defendant could be liable for a defamatory publication even if without fault with regard to the falsity of the publication or its defamatory character.[35]

The U.S. Supreme Court has substantially modified this common-law rule in decisions in which the Court has sought to balance two competing concerns: on the one hand, First Amendment freedom of expression, which would suffer if defamation liability were too easily imposed; and on the other hand, a state's interest in permitting those harmed by falsehoods to seek compensation from their detractors.[36] In a major departure from the common-law rule, the Court concluded in *New York Times Co. v. Sullivan* that the First Amendment bars public officials from recovering damages for defamatory statements relating to their official conduct "unless [the defamed official] proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[37] A few years later, a plurality of the Court extended a version of this constitutionally derived conditional

---

[35]     *See* RESTATEMENT (SECOND) OF TORTS § 580B cmt. b (1977) (noting that while the defendant had to be at least negligent with regard to the act of publishing the statement, no fault was required with regard to the falsity and defamatory character of the statement); *see also id.* ch. 25, topic 3, spec. note (describing the common-law conditional privilege that permitted a defendant to make a defamatory statement as long as the statement was made to protect certain defined interests and the defendant did not abuse the privilege); *id.* § 593 cmt. c (explaining that the common-law privilege was abused if the defendant did not believe the statement to be true or lacked reasonable grounds for so believing, and further explaining the U.S. Supreme Court's modification of this rule).

[36]     *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340-42 (1974) (explaining the tension between the need for a free press and the interest in redressing injury to reputation).

[37]     *New York Times*, 376 U.S. at 279-80.

privilege to defamation actions involving "public figures."[38]  In both cases, the Court prioritized First Amendment freedom of expression over the individual's interest in compensation for harm to reputation, at least where public officials or public figures were concerned.

But the conditional privilege derived from the U.S. Constitution, and the attendant actual-malice standard enunciated in *New York Times* and its progeny, do not necessarily protect defendants in defamation actions brought by private individuals.[39] The U.S. Supreme Court made this clear in *Gertz v. Robert Welch, Inc.*,[40] in which the Court held that the First Amendment imposes only the most minimal restrictions on state-law liability in defamation actions brought by private individuals.[41]  Rather than extending the stringent actual-malice test from *New York Times* to the private-party context, the Court concluded that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."[42]

---

[38]     *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967) (indicating that a public figure could recover damages by proving that the defamatory statement resulted from "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers").

[39]     *See Gertz*, 418 U.S. at 342-47.  As we discuss below, even if the actual-malice standard applied here, Greene has suffered no prejudice, as the superior court's rulings and jury instructions were consistent with that standard.

[40]     *Id.*

[41]     *Id.*

[42]     *Id.* at 347.  There was a brief period during which a plurality of the U.S. Supreme Court thought the actual-malice standard should apply in private-party defamation actions so long as the defamatory statements related to a matter of public

(continued...)

-22-                                                                        6941

We have never directly addressed the appropriate standard of liability in the private-party defamation context,[43] and we need not do so here. The superior court's ruling on conditional privilege and its corresponding instructions to the jury properly stated the First Amendment-based privilege that the U.S. Supreme Court has said applies when public officials or public figures are the target of defamation. Even if Tinker were a public official or public figure — and Greene does not claim Tinker is — Greene would be entitled to no greater privilege than that which the superior court recognized. The First Amendment requires no more, and under *Gertz* a state may require even less.[44]

Greene argues at length that the U.S. Supreme Court has recently changed course and has held that the First Amendment provides an absolute privilege even in the private-party context. She draws our attention to *Snyder v. Phelps*,[45] in which the U.S. Supreme Court rejected the state-law tort claims brought by the father of a deceased military service member against members of a religious group who staged a protest near his son's funeral. The Court, after closely examining the "content, form, and context of [the protestors'] speech,"[46] determined that the speech related to a matter of public

---

[42](...continued)
concern. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 43 (1971). But the Court disavowed that view in *Gertz*, 418 U.S. at 342-45, and even if *Rosenbloom* had survived Greene would enjoy at most a conditional privilege.

[43]    *See Schneider v. Pay 'N Save Corp.*, 723 P.2d 619, 625 (Alaska 1986); *see also DeNardo v. Bax*, 147 P.3d 672, 683 n.3 (Alaska 2006) (Eastaugh, J., dissenting) (noting that our precedents "have not been entirely clear" on whether actual malice is required or whether instead mere negligence is sufficient).

[44]    *Gertz*, 418 U.S. at 342-45.

[45]    131 S. Ct. 1207 (2011).

[46]    *Id.* at 1216 (citation and internal quotation marks omitted).

concern and concluded that in light of the circumstances of the protest, the speech was entitled to special protection under the First Amendment.[47] The Court set aside the jury verdict awarding the father damages under his state-law tort theories (which did not include defamation).[48]

Greene cites *Snyder* for the proposition that "speech involving a matter of public concern is inactionable."[49] But it requires some hard squinting to read *Snyder* as creating such a sweeping rule. *Snyder* contains no indication that the Court intended to depart at all — much less depart dramatically — from its carefully drawn defamation precedents, which provide only a conditional privilege even in the public official/public figure context, and allow states to set a fairly low bar for liability in the private-party context.[50] The Court makes clear when it intends to disavow its precedents, and if the Court had meant to extend blanket First Amendment protection to defendants in any defamation suit relating to a matter of public concern, it would have said as much.[51]

---

[47]     *Id.* at 1219.

[48]     *Id.* at 1219-20.

[49]     We do not address Greene's argument that the phrase "of public concern" must be interpreted broadly. The superior court concluded that medical confidentiality was not such an issue, and it is not clear whether Greene appeals that conclusion. For the purposes of this appeal we assume, without so deciding, that confidentiality was a matter of public concern. But because the First Amendment and Alaska law provide at most a conditional privilege to make defamatory statements under the circumstances of this case, it makes no difference here whether the issue was of public concern; the superior court recognized a conditional privilege, and the jury found Greene abused it.

[50]     *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *New York Times v. Sullivan*, 376 U.S. 254, 279 (1964).

[51]     *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier

(continued...)

Furthermore, the Court explicitly limited its holding in *Snyder* to the facts before it.[52] We do not need to detail the many ways in which the facts of the present case are different, but we do note that the *Snyder* Court placed particular emphasis on the public nature of the demonstration at issue in that case, noting that a public street is "[a] space [that] occupies a 'special position in terms of First Amendment protection.' "[53] That factor is clearly not present in the lawsuit before us here, as Tinker's defamation claim was based entirely on Greene's complaint to Tinker's supervisor at YKHC. Contrary to Greene's assertions, the First Amendment is not an all-purpose tort shield, and *Snyder* did not change this.[54]

---

[51](...continued)
authority *sub silentio*." (italics in original)). That principle is especially pertinent here because there was no defamation claim in *Snyder*; it is implausible that the Court would casually change an entire area of law under those circumstances.

[52]     The Court wrote:

> Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us. As we have noted, "the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case."

*Snyder*, 131 S. Ct. at 1220 (alteration in original).

[53]     *Id.* at 1218 (citation omitted). As the Court noted, " '[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate." *Id.* (alteration in original) (citation omitted).

[54]     We may also dispense briefly with Greene's argument that the Court's passing reference in *Snyder* to *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) created an absolute bar to defamation liability. *See Snyder*, 131 S. Ct. at 1211. *Hustler*
(continued...)

**2.**   **On the facts of this case, Alaska law provides at most a conditional privilege to complain to YKHC.**

Greene's argument based on the freedom-of-speech guarantee in the Alaska Constitution fares no better than her First Amendment-based claim.  As the text of our state constitutional provision makes clear, the right to speak freely is not an absolute one — speech in abuse of the right is not protected.[55]  Furthermore, Greene points us to no Alaska case in which we have based any privilege to defame — conditional or absolute — on our state constitution's free-speech provision.  And for good reason:  Our jurisprudence in this area is based not on state constitutional concerns but on common-law privilege doctrine.[56]

---

**54**(...continued)
involved both a defamation claim and a claim for intentional infliction of emotional distress, and the Court cited *Hustler* in *Snyder* merely to say that the reach of First Amendment protection includes the latter, and only under the circumstances before it in *Snyder*.  *Id.* at 1215, 1220.  Indeed, to the extent that *Hustler* deals with defamation at all, it is to recognize that even public figures — whose sensitivities are typically less protected — may sometimes have viable defamation claims without offense to the First Amendment.  *Hustler*, 485 U.S. at 52.

**55**      "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."  Alaska Const. art. I, § 5.

**56**      We may have suggested in *Doe v. Alaska Superior Court, Third Judicial District*, 721 P.2d 617, 627 (Alaska 1986), that the conditional privilege under Alaska law derives from the free-speech provision of our state Constitution when we noted that neither that provision nor the free-press clause provides an absolute defense to defamation.  However, in a more recent decision in which we discussed in depth the origins of the conditional privilege in Alaska, we clearly indicated that the free-speech provision is not the source of the privilege.  *See Taranto v. N. Slope Borough*, 992 P.2d 1111, 1114-15 (Alaska 1999) (citing *Pearson v. Fairbanks Publ'g Co.*, 413 P.2d 711, 714 (Alaska 1966)) (noting that in *Pearson*, the case in which we recognized a conditional privilege for speech about matters of public interest, we "carefully avoided

(continued...)

On the basis of common-law privilege, and consistent with the U.S. Supreme Court's First Amendment jurisprudence, we have recognized a state-law conditional privilege to make defamatory statements in a variety of contexts.[57] We have afforded only a conditional privilege even when speech relates to concerns as important as public health and safety[58] and the safety of employees in the workplace.[59] And we

---

[56](...continued) grounding [our] opinion in any constitutional rights to free speech, focusing instead on the common law conditional privilege.").

[57]     *See, e.g.*, *DeNardo v. Bax*, 147 P.3d 672, 678 (Alaska 2006) (recognizing a conditional privilege with respect to statements among co-workers about personal safety in the workplace, and affirming superior court's determination that defendant had not abused the privilege when she told co-workers she was worried plaintiff was stalking her); *Taranto*, 992 P.2d at 1114-15 (indicating that speech addressing matters of public health and safety is conditionally privileged, and affirming superior court's determination that city employee had not abused the privilege when she posted petition accusing taxicab operator of selling alcohol and illegal drugs); *Schneider v. Pay 'N Save Corp.*, 723 P.2d 619, 623-26 (1986) (recognizing a conditional privilege based on an employer-employee relationship and affirming superior court's determination that store's loss-prevention manager had not abused the privilege when he reported to management that a cashier had failed to enter sales into her cash register); *Doe*, 721 P.2d at 627 (noting that we have repeatedly declined to interpret the free-speech provision of the Alaska Constitution as providing absolute immunity against defamation liability, and observing that "[w]e have [instead] afforded defendants only a qualified privilege"); *Fairbanks Publ'g Co. v. Francisco*, 390 P.2d 784, 793 (Alaska 1964) (remarking that "[i]f the conditional privilege is abused by the writer or speaker[,] it is lost and he must answer for the legal consequences of his publication"). *See also MacDonald v. Riggs*, 166 P.3d 12, 16 n.8 (Alaska 2007) (declining, over dissent's objection, to address whether the defamatory statements were conditionally privileged, noting that the jury's finding that the defendant knew the statements were false showed that the defendant had abused the privilege if it applied).

[58]     *Taranto*, 992 P.2d at 1114-15.

[59]     *DeNardo*, 147 P.3d at 679.

have recognized only a conditional privilege even in the context of a newspaper's publishing articles on matters of public concern.[60]

Again, the superior court determined that Greene had a conditional privilege, the highest protection Greene's defamatory statement to YKHC could conceivably be afforded under Alaska law. The superior court's jury instruction indicated that the privilege would not protect Greene if she "published the defamatory statement for some purpose other than for which the privilege is given . . . or she knew the statement was false or entertained serious doubts about [its truth]." This instruction is consistent with our precedents on conditional privilege,[61] and does not violate the minimal restriction, imposed by *Gertz*, on state-law defamation liability in the private-party context.[62] The jury found that Greene abused the privilege, and Greene does not appeal the jury's verdict.

---

[60] *See Briggs v. Newton*, 984 P.2d 1113, 1121 (Alaska 1999) (citing *Schneider*, 723 P.2d at 623-24); *see also Green v. N. Publ'g Co.,* 655 P.2d 736 (Alaska 1982).

[61] *See MacDonald*, 166 P.3d at 16 n.8 (quoting RESTATEMENT (SECOND) OF TORTS § 600 (1977) (indicating that abuse of the privilege occurs if a defendant knows the statement is false or acts with reckless disregard as to its truth or falsity)); *Moffatt v. Brown*, 751 P.2d 939, 941 (Alaska 1988) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (distinguishing reckless conduct from merely negligent conduct and explaining that reckless disregard for truth or falsity is proven if there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication")) (emphasis omitted); *Schneider*, 723 P.2d at 624-25 (quoting RESTATEMENT (SECOND) OF TORTS § 599 (1977) (explaining that a defendant abuses the privilege if "the defamatory matter is published for some purpose other than that for which the particular privilege is given")).

[62] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-45 (1974) (prohibiting only strict liability in the private-party defamation context).

**B.    The Superior Court Properly Rejected Greene's Argument That Tinker's Alleged Discovery Violations Warranted Granting Summary Judgment Or Fact Establishment.**

Greene argues that Tinker's discovery responses were so evasive that the superior court should have granted Greene's motion for summary judgment or should have sanctioned Tinker with fact establishment.  Greene details several of Tinker's allegedly inadequate responses, including Tinker's response to a request for admission in which Tinker objected that the terms "voice," "opinion," and "complaint" were excessively vague.  But as the superior court observed when it considered (and rejected) these arguments, remedies for failures to make a proper disclosure or cooperate in discovery are governed not by summary judgment but by Alaska Civil Rule 37.[63]  Simply put, a motion for summary judgment was not the proper avenue to address alleged discovery violations, and Greene never sought discovery sanctions by the proper means.[64]  The superior court therefore properly denied Greene's motion for summary judgment.

---

[63]    Alaska Rule of Civil Procedure 37 provides that the court may issue an order to compel disclosure or discovery under certain conditions, one of which is that the party subject to the order must have acted "willfully" in impeding discovery.  Rule 37 also provides for sanctions, including fact establishment, if a party fails to obey an order to compel.

[64]    Furthermore, even if Greene had filed a Rule 37 motion, fact establishment likely would have been improper.  As the superior court correctly noted, fact establishment is a draconian measure that is typically granted only when a party seeks an order to compel, the court issues the order, and a party subject to the order refuses to obey it. *See Stephanie W. v. Maxwell V.*, 319 P.3d 219, 227 (Alaska 2014) (rejecting argument that Rule 37(d) motion for fact establishment was proper to address unanswered interrogatories, because party seeking fact establishment did not first seek order to compel "or other, less-draconian options," and noting that the superior court "would have abused its discretion had it granted such litigation-ending sanctions without first exploring alternative remedies").

**C.** **The Superior Court Did Not Abuse Its Discretion In Permitting The Testimony Of Teresa Paukan.**

Greene argues that the superior court erred when it denied her motion to preclude the testimony of Teresa Paukan, whom Tinker identified as a witness who could explain how Tinker learned Greene was pregnant without looking at Greene's medical file. Greene argues that the superior court should not have admitted Paukan's testimony because Tinker identified her nearly a month after the close of discovery even though Tinker must have known that Paukan would be her key witness.

As noted above, decisions by the superior court to admit or exclude evidence are reviewed for abuse of discretion.[65] Although the superior court generally has broad discretion in determining appropriate sanctions for discovery violations, "the trial court's discretion is limited when the effect of the sanction it selects is to . . . preclude evidence on a central issue."[66] For preclusion to be justified in such cases, "Rule 37(b)(3) requires a finding of 'willfulness,' as well as the consideration of several factors, including whether lesser sanctions would adequately protect the opposing party."[67] Indeed, we have concluded that it was not an abuse of discretion for a court to permit the testimony of a witness disclosed after the close of discovery, even where there was a pretrial order specifically requiring advance disclosure of witnesses.[68]

---

[65] *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 349 (Alaska 2012).

[66] *Stephanie W.*, 319 P.3d at 224-25 (internal quotation marks omitted). Although Greene did not seek a Rule 37(b) sanction, we treat orders relating to preclusion of witnesses as such sanctions if their effect is to determine a central issue in the case. *Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 325 (Alaska 2007). We therefore analyze the superior court's decision under the Rule 37(b) rubric.

[67] *Maines*, 155 P.3d at 325 (citation omitted).

[68] *See City of Kotzebue v. McLean*, 702 P.2d 1309, 1315 (Alaska 1985).

Paukan's testimony was central to Tinker's case: As Tinker explained to the superior court when she sought to identify Paukan as a witness, Paukan would testify as to how the news of Greene's pregnancy reached Tinker. This testimony would (and did) undermine Greene's version of the relevant facts, and it was therefore "evidence on a central issue." At the time the superior court denied Greene's motion to preclude, it pointed out several specific facts in support of its conclusion: that after learning of Paukan's likely testimony, Greene had let several weeks pass before seeking to exclude it; that Greene's counsel had declined on the record to depose Paukan when offered the opportunity, despite the acceptability and low cost of telephonic depositions; that Greene could easily have located Paukan as they knew each other and lived in the same village; and that Greene had not demonstrated that Tinker's late disclosure was willful. The superior court carefully considered all of these facts and concluded that the prejudice to Tinker that would result from excluding Paukan's testimony and the other evidence Greene sought to exclude "substantially outweigh[ed] the gravity of the late disclosure." In light of the superior court's careful analysis, we see no basis to conclude that the superior court abused its discretion in permitting Paukan to testify.

## D. The Superior Court Did Not Abuse Its Discretion In Excluding Evidence Of Alleged Prior Bad Acts By Tinker.

Greene argues that the superior court also erred in granting Tinker's motion in limine regarding evidence of Tinker's alleged prior bad acts.[69] At trial Greene sought

---

[69] Greene frames the argument in various ways, including in terms of violations of her state and federal constitutional rights. But because the issue is essentially one of admissibility of evidence, the standard of review is whether the superior court abused its discretion. *Barton*, 268 P.3d at 349. Among Greene's constitutional claims is that the superior court violated her right to a jury trial under the Seventh Amendment to the U.S. Constitution. But as we have previously observed, the Seventh Amendment does not apply to state court proceedings, and thus we do not

(continued...)

to call as witnesses several other Pilot Station residents to testify about alleged prior breaches of medical confidentiality by Tinker; Greene also sought to present testimony from Tinker's supervisor, Sheila Minock, regarding alleged documentation of complaints absent from Tinker's personnel file. The superior court barred these witnesses from testifying when it granted Tinker's motion in limine, confirming this ruling in its simultaneous order denying Greene's motion for a protective order. Greene also briefly challenges the superior court's decision to exclude the testimony of Palassa Beans, who Greene says would have testified to Tinker's harassment of Greene around the time Tinker sought the protective order against Greene.[70] Greene contends on appeal that "the trial court's rulings, when taken in their totality, eviscerated her case."

Greene provides little substantive argument that the trial court abused its discretion in excluding the above-mentioned bad-acts testimony. But to the extent that she makes the argument, it is unpersuasive. The testimony Greene sought to introduce might have supported her argument that disclosures at the clinic were a matter of public concern. But the superior court concluded that the bad-acts testimony would be moot in light of the determination that Greene enjoyed only a conditional privilege to complain. And in light of our conclusion that Greene had, at most, a conditional

_____

[69](...continued)
address Greene's argument on this point. *See Vinson v. Hamilton*, 854 P.2d 733, 736 (Alaska 1993).

[70]     Greene addresses the superior court's exclusion of Beans's testimony in another section of her brief, which ostensibly focuses on the superior court's supposed error in granting a directed verdict for Tinker on Greene's abuse-of-process claim. However, because Greene makes a general challenge to the superior court's evidentiary rulings, we address her complaint about the exclusion of Beans's testimony at the same time as we address Greene's other arguments relating to the exclusion of evidence of alleged prior bad acts by Tinker.

privilege, the bad-acts testimony would be irrelevant, and we cannot conclude that the superior court abused its discretion when it excluded irrelevant evidence.[71]

### E. The Superior Court Did Not Err In Instructing The Jury On Defamation Per Se.

Greene argues that the superior court also erred when it instructed the jury on defamation per se rather than defamation per quod, thereby making it unnecessary for Tinker to prove actual damages.[72] Greene's legal argument is somewhat difficult to discern, but the implication seems to be that Tinker could not have prevailed on her defamation claim if she had been required to prove actual damages, given that she eventually conceded that Greene's complaint was not the cause of her termination. Greene argues that the superior court's instruction on defamation per se resulted in "substantial prejudice" to Greene, presumably because Tinker's prevailing on her defamation claim contributed to her being the prevailing party for purposes of attorney's fees.

---

[71] Alaska Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[72] A statement is defamatory per se "[if] the words used [are] so unambiguous as to be reasonably susceptible of only one interpretation — that is, one which has a natural tendency to injure another's reputation . . . . But if the language used is capable of two interpretations, one of which would be defamatory and the other not, then it is for the jury to determine which meaning would be given the words by those who read them. If the latter alternative is applicable, the statement is defamatory per quod." *Alaska Statebank v. Fairco*, 674 P.2d 288, 295 n.15 (Alaska 1983) (omission in original) (citation omitted). *See also* RESTATEMENT (SECOND) OF TORTS § 569 cmt. b (1977) (noting that a defendant may be liable for a publication that is actionable per se "although no special harm results from it"); *id.* at § 575 (defining "special harm" as "the loss of something having economic or pecuniary value").

We see no error in the superior court's instruction on defamation per se. Among the categories of publications that are defamatory per se are statements that impute to the plaintiff "conduct . . . that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession."[73] Here, Greene alleged to Tinker's employer that Tinker had violated patient confidentiality — conduct that would adversely affect a person's fitness to be employed at a medical clinic, where a reputation for trustworthiness in handling confidential records is extremely important. Tinker was thus not required to prove special harm, and it was not error for the superior court to instruct the jury on defamation per se.

## F. The Superior Court Did Not Err In Granting A Directed Verdict On Greene's Counterclaim Of Abuse Of Process.

Greene argues that the superior court also erred when it granted Tinker's motion for a directed verdict on Greene's abuse-of-process counterclaim. Greene claims that in granting the directed verdict, the superior court created "*absolute immunity* for

---

[73] RESTATEMENT (SECOND) OF TORTS §§ 570, 573 (1977). The other traditionally recognized categories are publications that "impute[] to the [plaintiff] . . . a criminal offense, . . . a loathsome disease, . . . or . . . serious sexual misconduct." *Id.* § 570. The defamatory-per-se categories are ordinarily described with reference to slander — the publication of defamatory matter by spoken words. *See id.* §§ 568, 570. They might thus be thought inapplicable to the present case because Tinker's claim was based not on spoken remarks but rather on the written complaint to YKHC. But courts in other jurisdictions have not hesitated to apply these categories even where the alleged defamation was written. *See, e.g.*, *Tuite v. Corbitt*, 866 N.E.2d 114, 129 (Ill. 2006) (applying the defamation-per-se categories where plaintiff alleged that statements about him in a book were defamatory per se because they imputed to him criminal wrongdoing and an inability to perform his professional duties as an attorney); *Hancock v. Variyam*, 400 S.W.3d 59, 63-64 (Tex. 2013) (rejecting claim that statements about a doctor in a letter were defamatory per se on ground that the alleged statements did not relate to his fitness as a doctor, but not remarking on the written, rather than oral, nature of the statements).

Tinker . . . [and] for any individual who misuses the domestic violence protective scheme."[74] (Emphasis in original.)

We review a directed verdict by inquiring "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors."[75] In making this inquiry, we bear in mind that a motion for a directed verdict "should be scrutinized under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution."[76]

Abuse of process consists of two elements: (1) an ulterior purpose, and (2) a "willful act in the use of the process not proper in the regular conduct of the proceeding."[77] We have previously explained that "the mere filing or maintenance of a lawsuit — even for an improper purpose — is not a proper basis for an abuse of process action."[78] Rather, "[t]he second element of the tort of abuse of process contemplates

---

[74]       Tinker argues that Greene impermissibly changed her theory for the abuse-of-process claim the day before trial began. Tinker argues that initially Greene's theory was that Tinker committed abuse of process by using the domestic violence petition process to label Greene a "stalker," but that Greene's theory later became that Tinker committed abuse of process by making and then strategically withdrawing the domestic violence petition. Although Greene did frame the claim slightly differently at different stages, the substance of it seems to have remained consistent: that Tinker used domestic violence proceedings for an improper purpose.

[75]       *Taylor v. Wells Fargo Home Mortg.*, 301 P.3d 182, 191 (Alaska 2013).

[76]       *Id.*

[77]       *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988).

[78]       *Id.* (quoting *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 728 P.2d 1202, 1209 (Cal. 1986)) (internal quotation marks omitted).

some overt act done in addition to the initiating of the suit."[79]  Therefore, to avoid a directed verdict, Greene needed to demonstrate that there could be diversity of opinion among reasonable jurors not only with respect to the propriety of Tinker's purpose in bringing the domestic violence proceedings, but also with respect to whether Tinker then took some additional overt act.  Greene satisfies the first element but not the second.

Reasonable jurors might have differed as to whether Tinker had an improper purpose in seeking the protective order.  There might have been disagreement with respect to Tinker's purpose when she mentioned in her petition for a protective order that Greene had filed a complaint with YKHC against Tinker in 2007.  YKHC substantiated the 2007 complaint and disciplined Tinker for the privacy violation, so it is difficult to see what proper purpose Tinker could have in later describing the 2007 complaint as harassment.  Viewing the facts in the light most favorable to Greene as the non-moving party, we conclude that reasonable jurors could have disagreed about whether Tinker had a proper purpose in mentioning the 2007 complaint in her petition for a protective order.[80]

We have not previously addressed what additional overt act satisfies the second element in abuse-of-process claims arising from domestic violence proceedings, but in *Meidinger v. Koniag, Inc.*,[81] we set a high bar for the overt act in a different context.  It is plain that Greene does not clear that high bar; the directed verdict was therefore proper.

---

[79]  *Id.*

[80]  Tinker's references in her petition to the other alleged acts of harassment by Greene — the 2011 complaint and Greene's public complaints at the tribal council meeting — seem more innocuous, given that Tinker knew that Greene's 2011 accusation was false.

[81]  31 P.3d 77 (Alaska 2001).

In *Meidinger* we affirmed the dismissal of an abuse-of-process counterclaim brought by a group of shareholders in a corporation after the corporation sued the shareholders over allegedly false and misleading proxy statements made in connection with the election of the board.[82] The shareholders argued that various actions by the corporation following the initial suit constituted the additional overt act required for abuse of process.[83] These acts included the corporation's requesting injunctive relief denying a shareholder her seat on the board; threats by the corporation that the shareholders would face a large attorney's fee award; publicizing the lawsuit to gain an advantage over the shareholders in future elections; and sending a flyer to other shareholders accusing the group in question of violating federal securities laws.[84]

We concluded that the first and second actions (in addition to others not listed here) were actions taken in the regular course of litigation and thus could not be the basis of an abuse-of-process claim.[85] More significantly for the present case, we concluded that the last two listed acts also did not constitute requisite willful acts, even though those acts had little conceivable connection to the initial lawsuit and were oriented toward discrediting the shareholders.[86]

---

[82]   *Id.* at 81.

[83]   *Id.* at 86.

[84]   *Id.*

[85]   *Id.*

[86]   *Id.*; *see also Weber v. State*, 166 P.3d 899, 903 (Alaska 2007) (citing *Meidinger* and rejecting a claim of abuse of process on the ground that there was no additional overt act where an assistant attorney general filed a motion to dismiss in the ordinary course of litigation).

Here, the only act Tinker took after she began the domestic violence process was to withdraw her petition in anticipation of filing the present case. We set a high bar in *Meidinger* for what constitutes an additional overt act, and merely withdrawing a previously filed petition cannot meet that standard. The superior court committed no error in granting a directed verdict in favor of Tinker on her abuse-of-process claim.

**G.** **The Superior Court Did Not Abuse Its Discretion In Awarding Attorney's Fees To Tinker.**

Greene argues that the superior court erred in awarding Tinker $12,015 in Rule 82 attorney's fees.[87] This award represented 30% of Tinker's actual reasonable attorney's fees.

We review an award of attorney's fees for abuse of discretion and will not reverse it unless it is manifestly unreasonable.[88] Greene does not argue that the superior court's award of attorney's fees was manifestly unreasonable. Rather, her argument is that because Rule 82(b)(3) permits a court to vary an award on the basis of equitable factors,[89] it was an abuse of discretion for the superior court not to vary the award here.

---

[87] Alaska Rule of Civil Procedure 82(b)(2) states:

In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred, and shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred.

[88] *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 157 (Alaska 2012).

[89] These factors include:

(continued...)

We are not persuaded that the superior court abused its discretion in making this award. As we have previously noted, "[a]pplication of Rule 82(b)(3) factors is

---

[89] (...continued)

    (A)    the complexity of the litigation;

    (B)    the length of trial;

    (C)    the reasonableness of the attorneys' hourly rates and the number of hours expended;

    (D)    the reasonableness of the number of attorneys used;

    (E)    the attorneys' efforts to minimize fees;

    (F)    the reasonableness of the claims and defenses pursued by each side;

    (G)    vexatious or bad faith conduct;

    (H)    the relationship between the amount of work performed and the significance of the matters at stake;

    (I)    the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts;

    (J)    the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party or its insurer; and

    (K)    other equitable factors deemed relevant. If the court varies an award, the court shall explain the reasons for the variation.

Alaska R. Civ. P. 82(b)(3).

discretionary, not mandatory."[90]  Thus awards of attorney's fees made pursuant to the

schedule set out in Rule 82 are presumptively correct, and the superior court need not

make any findings in support of the award.[91]  There are several factors that indicate that

the award was reasonable here.  As the superior court explained, pleadings and motion

work in this case were extensive, and included "repetitive [and] circuitous" pleadings and

motions filed by Greene that "lacked focus."  There were multiple pretrial conferences

and a jury trial lasting three days, during which the superior court heard testimony from

at least nine witnesses.  Furthermore, the superior court determined that Greene's trial

tactics "consumed far more time than was warranted by the complexities and real issues

in the case."  Greene's argument that the superior court abused its discretion in making

this award is not supported by the case law, which indicates that a court *may* depart from

the Rule 82 schedule by considering the enumerated equitable factors but is by no means

required to do so.[92]

---

[90]    *Rhodes v. Erion*, 189 P.3d 1051, 1055 (Alaska 2008).  As Rule 82(b)(3)
explains, "[t]he court may vary an attorney's fee award . . . if, upon consideration of the
factors listed below, the court determines a variation is warranted."

[91]    *Babinec v. Yabuki*, 799 P.2d 1325, 1337 (Alaska 1990).

[92]    *See Rhodes*, 189 P.3d at 1055.  Greene cites one case in which we
concluded that the superior court had abused its discretion in its award of attorney's fees,
but in that case the superior court had awarded one party the *entire* amount of its
attorney's fees even though the losing party had not acted in bad faith.  *See Cont'l Ins.
Co. v. U.S. Fid. & Guar. Co.*, 552 P.2d 1122 (Alaska 1976).  We concluded that there
was an abuse of discretion because the purpose of Rule 82 is to provide *partial*
compensation to a prevailing party and a full award is appropriate only in rare
circumstances.  *Id.* at 1129.  In the present case there was only a partial award.

Greene's reliance on *Crook v. Mortenson-Neal* and *Gold Dust Mines v.
Little Squaw Gold Mining Co.* is equally misplaced.  In both cases, we affirmed an
enhanced attorney's fee award because of the litigation tactics of the losing party.  *See*
(continued...)

Greene draws attention to various factors that she argues require reconsideration of the attorney's fee award; she asserts that Tinker's intentional-interference claim was brought in bad faith and that Tinker's claim for actual damages for defamation was "fabricated."  But the superior court was in the best position to evaluate Tinker's motivations, and the superior court concluded that Tinker's decision to avoid litigating these issues was a legitimate tactical trial decision.  The superior court's award of $12,015 in attorney's fees to Tinker was not an abuse of discretion.

## V.     CONCLUSION

For the foregoing reasons, the judgment of the superior court is AFFIRMED.

---

[92](...continued)
*Crook v. Mortenson-Neal*, 727 P.2d 297, 306 (Alaska 1986); *Gold Dust Mines*, 299 P.3d at 170.  But here Greene is asking us to overturn not an enhanced award but an award calculated strictly according to the formula that Rule 82 indicates should be used when the prevailing party recovers no money judgment.  The superior court had discretion to depart from that formula; it was not an abuse of discretion for it to decline to do so.